RUBÉN PÉREZ CRUZ y OTROS, demandantes y recurridos, *v.* HOSPITAL LA CONCEPCIÓN, demandado y recurrente.

*Número:* R-83-423 *Resuelto:* 29 de octubre de 1984

*Charles De Mier LeBlanc,* de *Miranda, Cárdenas, De Corral & Rodríguez,* abogado del recurrente; *Wilfredo A. Géigel,* abogado de la parte recurrida.

EL JUEZ ASOCIADO SEÑOR NEGRÓN GARCÍA emitió la opinión del Tribunal.

En casos de daños por negligencia médico-hospitalaria rige en nuestra jurisdicción una norma de consenso, muro de contención y contrapeso a la gama de intereses diversos y encontrados que suscita toda acción de esta naturaleza. "[L]a aplicación del estándar de prueba en la relación causal: [no implica] ni excesiva rigidez que impida probar una reclamación válida por la imprudencia profesional del médico o la deficiente atención hospitalaria, ni la laxitud que abre las puertas a la especulación y a la conjetura." *López* v. *Hosp. Presbiteriano, Inc.,* 107 D.P.R. 197, 223 (1978).

I

*Trasfondo fáctico*

El domingo 11 de diciembre de 1977, como a las 2:45 A.M., Rubén Pérez Vargas chocó contra un árbol el automóvil que conducía hacia Lajas. Regresaba de una boda familiar a la que había acudido acompañado de su cuñado Pedro Elmer Cruz quien le seguía en su vehículo a corta distancia. Allí había "bebido". Transitaba a una velocidad aproximada de 25 a 30 millas por hora. Su cuñado relató que un animal, presumiblemente un perro, salió al paso de Rubén, éste trató de desviar y chocó. Un policía de apellido Palermo se percató del accidente y se personó al lugar. Observó que el conductor estaba incrustado en el guía. Lo describió en posición doblada hacia el frente y agarrándose el abdomen. Poco después llegó su cuñado y lo observó sangrando por el rostro. Notó que botaba sangre y se cogía el estómago.

Pérez Vargas fue llevado por su cuñado al Centro de Diagnóstico y Tratamiento del Municipio de Lajas. Durante el trayecto se quejaba de dolor, principalmente en el estómago. Entró caminando a dicho dispensario. Permaneció media hora. No lo pudieron atender porque no había médico después de las doce de la noche. Desde esa hora las enfermeras referían los pacientes al Hospital La Concepción, particularmente los casos de accidentes de automóviles cubiertos bajo A.C.A.A. Carecían de las facilidades necesarias para atender pacientes que sufrieran traumatismos serios y aquellos que pudieran requerir cirugía. Se limitaban a la observación clínica del paciente. El referido sólo expresó que "el paciente iba guiando y chocó un árbol recibiendo herida en la nariz".

Con carácter de emergencia, se verificó el traslado al Hospital La Concepción en una ambulancia municipal. El paciente iba en una camilla. Estaba consciente y se quejaba. Al llegar a esa institución el chofer de la ambulancia se percató de que Pérez Vargas se agarraba con las dos manos el lado izquierdo sobre la cintura.

Poco después arribó su cuñado Elmer Cruz. Lo notó bien pálido, quejándose, sudando, acostado en una camilla, encogido de lado y con las rodillas puestas hacia el pecho. Le molestaba mucho también el golpe en la nariz. Pérez Vargas permaneció allí como una hora y 45 minutos. El Dr. Carlos González, galeno en funciones a cargo de la Sala de Emergencia esa madrugada, atestó que el paciente le relató que "se había dado en la nariz". Procedió a interrogarlo, examinó su laceración, le practicó un examan físico, revisó el tórax, luego el abdomen e hizo "una inspección visual luego de una auscultación, palpación, depresión suave y profunda. No [le] dio ningún indicio de dolor". Aun así, le examinó todas las extremidades, pero sin manifestación de ningún dolor. Indicó que su preocupación primordial "era que la nariz le quedara bonita". Según su versión lo instruyó que regresara al día siguiente para ser visto por un otorrino-

laringólogo. Además, que volviera a la Sala de Emergencia si se sentía mal. El doctor González atestó que la reacción del paciente a sus instrucciones fue: "Ahora me voy de fiesta." Los exámenes físicos consistieron en unas placas de la cabeza y de las cervicales. Se diagnosticó una fractura del hueso nasal. El récord de la Sala de Emergencia contiene:

> Paciente masculino de 43 años de edad viene a Sala de Emergencia en ambulancia referido de Centro de Salud de Lajas y refiere que hace aproximadamente una hora mientras conducía su automóvil por la carretera 303, cerca del kilómetro uno, perdió el control del auto que conducía (aparentemente suyo) y chocó con un árbol. Los campos pulmonares están claros y *el abdomen blando, depresible, no doloroso. La presión de la sangre era 110/80*, la temperatura 36° y el pulso era 88/20. (Énfasis suplido.)

El tribunal de instancia concluyó que el hospital alteró ese récord, añadiendo la nota referente al "abdomen blando, depresible y no doloroso". Igualmente varió la anotación relativa a la presión diastólica la cual debió leer 110/60.

La enfermera asistente reiteró fundamentalmente el testimonio del doctor González. Indicó que Pérez Vargas llegó caminando, en contradicción con la versión del chofer de la ambulancia. Lo describió como un "paciente consciente, alerta, comunicativo". Semejante cuadro de normalidad no armoniza con el hecho de que la ambulancia llegó con el biombo encendido, situación que la hizo avanzar hasta la entrada de emergencia. La testigo mostró dudas al ser confrontada con posibles alteraciones al récord médico.

Pérez Vargas objetó la determinación del doctor González de enviarlo a su casa. Una vez en su hogar no pudo acostarse debido al dolor. No podía evacuar ni orinar. Se quejaba mucho del estómago y se veía más grueso de lo normal. Así pasó la madrugada. A las 9:00 A.M. de ese mismo día, cuando abrieron la farmacia, sus familiares le compraron las medicinas recetadas. Cuando ingirió las pastillas se le afectó mucho la respiración. A pesar de ese cuadro, sus

parientes decidieron esperar a ver si las pastillas lo calmaban como el doctor González les había indicado. No fue así. Continuó mal. Sudaba demasiado y no podía respirar. Entonces optaron por llevarlo otra vez al dispensario de Lajas porque la condición del paciente era demasiado grave y éste era el lugar más cercano en donde podía recibir atención médica. Además, en el Hospital La Concepción sólo le habían dado un referido para sacarle placas.

En el dispensario el paciente fue recibido por el Dr. Hostos Fernández Naranjo a las 10:45 A.M. Éste indicó que "llegó sumamente intranquilo, una desesperación extrema, se quejaba de que le dolía acá en el pecho . . . pero también se ponía la mano derecha en el vientre". Apuntó en el historial:

> Refiere la esposa que el paciente tuvo un accidente anoche. Fue atendido en el Hospital La Concepción. Esta mañana empezó a quejarse de dolores en el lado izquierdo del pecho con dificultad para respirar y sudando frío y pálido.

Dicho facultativo inmediatamente procedió a prestarle los primeros auxilios. Lo examinó. Detectó fractura al nivel de las costillas quinta, sexta y séptima. A juicio suyo, el cuadro era extremadamente peligroso. Pérez Vargas se estabilizó un poco. Cuando se estaban haciendo los preparativos para trasladarlo nuevamente al Hospital La Concepción murió súbitamente a la 1:00 P.M.

Su autopsia reveló una laceración del tercio medio del mesenterio cerca de la implantación del intestino delgado. La laceración medía 2" x 1" de ancho, estaba abierta e iba de lado a lado del mesenterio. Ello produjo una hemorragia de más de 2000 cc. de sangre libre y coagulada en la cavidad abdominal. Presentaba un hematoma por arriba de la región inguinal derecha que medía 6 centímetros. Aparecieron cinco (5) costillas del lado izquierdo astilladas (la 5ta, 6ta, 7ma, 8va y 9na, antero-lateral).

El tribunal declaró con lugar la demanda presentada por su viuda Norma I. Cruz Rodríguez e hijo, Alberto Pérez

Cruz, contra el Hospital La Concepción. (¹) Acordamos revisar.

## II

*Análisis de errores*

██ El error relativo a si la prueba sostiene la determinación del tribunal de instancia sobre la responsabilidad del hospital fundada en que Pérez Vargas careció de diagnóstico y tratamiento adecuado, no fue cometido. Así lo revela una lectura crítica e integral de la transcripción de evidencia y las inferencias que la misma permite. Se impone un respeto a la aquilatación de credibilidad del foro primario en consideración a "que sólo tenemos . . . récords mudos e inexpresivos". (²) Esas apreciaciones deben ser objeto de gran deferencia en ausencia de circunstancias extraordinarias o indicios de pasión, prejuicio, parcialidad o error manifiesto que nos muevan a intervenir. *Cervecería India, Inc.* v. *Orange Crush*, 83 J.T.S. 26. Al reiterar la existencia de negligencia hemos de enfatizar que no estamos ante un mero error de juicio o diagnóstico equivocado. Detectamos, más bien, una *omisión de diagnóstico apropiado* que da margen a responsabilidad profesional. *Morales* v. *Hosp. Matilde Brenes*, 102 D.P.R. 188, 194 (1974). Este enfoque se deriva de "la omisión de la diligencia exigible, mediante cuyo empleo podría haberse evitado el resultado dañoso". *Jiménez* v. *Pelegrina Espinet*, 112 D.P.R. 700, 704 (1982). Veamos.

_____

(¹) A la viuda Norma I. Cruz Rodríguez le concedió $60,000 por angustias mentales y pérdida de consorcio; $2,500 por la causa heredada de los sufrimientos de Pérez Vargas; y $111,055.53 por lucro cesante. A su hijo Alberto Pérez Cruz, $25,000 por sufrimientos y angustias mentales, más $2,500 por concepto de la causa heredada y $7,530.21 por lucro cesante. Además impuso $7,000 en honorarios de abogado, costas, más intereses desde la radicación de la demanda.

Más adelante pasaremos juicio sobre la razonabilidad y corrección de estas indemnizaciones.

(²) *López* v. *Hosp. Presbiteriano, Inc.*, 107 D.P.R. 197, 225 (1978). (Opinión disidente del Juez Asociado Señor Irizarry Yunqué.)

A—*Visión y misión de una Sala de Emergencia*

█ Primeramente, se destaca el hecho de que el doctor González estaba haciendo el internado en el Hospital La Concepción. Se desempeñaba en la Sala de Emergencia solo y sin supervisión médica directa. La prueba pericial de los propios demandados recurrentes Hospital *et al.*, tiende a sostener que un joven galeno que sólo lleva 5 meses en su internado, no es la persona idónea para atender dicha sala, atendidas las circunstancias excepcionales que cotidianamente se presentan. La tendencia ha sido abandonar la práctica de que los internos hagan guardia sin supervisión médica directa en las Salas de Emergencia auxiliados indirectamente por el mecanismo de médicos disponibles mediante llamada (*attending physicians on call*). *Legal Problems of Emergency Outpatient Care*, Nat. Medicolegal Simposium 8–14 (1973).

La práctica debe cesar en Puerto Rico. Aun reconociendo las dificultades de reclutamiento y los costos que ello genera, la importancia de una Sala de Emergencia es incuestionable. Su nombre lo prueba: emergencia. Brindar este servicio a través de internos o de personal menos experimentado es un contrasentido. Sólo nos es posible sancionarla si existe una supervisión inmediata y efectiva que supla las deficiencias y falta de experiencia del interno u otro personal. J. Kulowski, *Crash Injuries*, Cap. 30, en C. C. Thomas, *The Basic Emergency Room Services*, Illinois, 1960, pág. 518. El caso de autos ilustra patéticamente la sabiduría de este criterio judicial. Al ser confrontado el doctor González, a base de su experiencia previa, sobre una lesión del mesenterio indicó: "Había visto sangrados abdominales pero no recuerdo . . . o sea, *nunca había estudiado un caso de laceración del mesenterio, no lo había visto en sí.*" (T.E., pág. 356.)

Esta inexperiencia se agrava ante la realidad de que ese tipo de lesión es difícil de diagnosticar. Sin embargo, las autoridades consultadas coinciden en que la "mayor parte de las lesiones civiles por traumatismos no penetrantes son cau-

sados por accidentes automovilísticos. Con mucha frecuencia hay lesiones concomitantes". Hawthorne, Frotese & Sterling, *Abdomen Agudo*, Ed. Interamericana, Méjico, 1969, pág. 338. Si los hallazgos que reveló el protocolo de autopsia estaban presentes en el momento del examen, indudablemente éste "iba a dar unos síntomas y signos claros de dolor abdominal de vientre agudo, probablemente con abdomen distendido y el paciente iba a estar severamente enfermo, con presión baja, pulso rápido". (T.E., pág. 301.) Aunque una lesión del mesenterio puede presentar síntomas atípicos, siempre están referidos a un dolor debido a que la sangre en el peritoneo siempre lo produce. Moseley, *Accident Surgery*, New York, Appleton, Century Crofts, 1962, Vol. I, págs. 128–131. Incuestionablemente 2000 ó 3000 cc. de sangre en la cavidad abdominal era un cuadro de irritación que produce dolor. Los peritos de los demandados recurrentes atestaron que un paciente que pierde la mitad de su volumen sanguíneo y no se trata "va a morir".

De igual modo resulta extraño la ausencia de mención sobre las costillas rotas. El neurólogo Iván León Rivera atestó que si estaban presentes al momento del examen debían haber sido diagnosticadas "por lo menos a la palpación". (T.E., pág. 325.) Según criterio compartido por los peritos de los demandados recurrentes, el médico asignado a la Sala de Emergencia debe ser un médico juicioso que hace su historial y examen médico completos lo más rápidamente posible. La calidad, plenitud y suficiencia de un examen médico fue sacrificada por el doctor González. No hay hechos o circunstancias extraordinarias en el récord que permitan excusarlo. No atendía varios pacientes a un mismo tiempo, cuando es menester establecer prioridades en atención de aquellos que presentan. cuadros de emergencia. El doctor León Rivera se refirió al historial de dicho galeno como uno "que no exigiría a sus estudiantes". (T.E., págs. 291-292.) Aun así, curiosa e inexplicablemente estimó que era "razonable" para una Sala de Emergencia. Advirtió

además la posibilidad de lesiones que puedan manifestarse con el transcurso del tiempo. Sin embargo, a base de los documentos que examinó concluyó que "[s]ería lo más lógico" concluir que las referidas lesiones fueron consecuencia del accidente automovilístico. (T.E., pág. 310.) "[C]omo la mitad de las lesiones abdominales no penetrantes son causadas por accidentes automovilísticos . . . frecuentemente se sospecha de lesiones intraabdominales causadas al impactar el guía . . . ." (Traducción nuestra.) Kulowski, *op. cit.*, pág. 403. McChelland, Jones, Shires & Perry, *Care of the Trauma Patient, Trauma to the Abdomen,* G. T. Shires (editor), 1966, pág. 354 y ss.; Moseley, *op. cit.,* pág. 128; Felson, *Roentgenology of Fracture and Dislocations,* New York, Grume & Straton, 1978, pág. 69. El doctor León Rivera fue categórico al expresar que "si tuviera yo la ligera sospecha de que pudo haber habido traumatismo abdominal y que hay estos signos presentes, yo definitivamente *no lo mandaría a su casa*". (T.E., pág. 328.)

Admitió que si Pérez Vargas tenía las lesiones que surgen de la autopsia al momento de ser atendido en la Sala de Emergencia, recibió un tratamiento negligente. (T.E., pág. 315.)

Cabe destacar que un paciente que es operado a tiempo de una lesión del mesenterio sobrevive en un 99% de los casos. (T.E., pág. 139.)

De un examen de los records del hospital no encontramos en ninguna parte anotación del riguroso examen que el doctor González alegadamente le practicó al paciente. Por el contrario, aparecen alteraciones de números y notas insertadas. Si algo tiende ello a demostrar es la falta de un diagnóstico adecuado. En este aspecto coincidimos con el doctor Suau, perito de los demandantes recurridos, en que si el referido examen se practicó, fue tan superficial que no permitió al médico percatarse de ciertas lesiones existentes. (T.E., pág. 127.)

En el pasado hemos reprobado con preocupación

la laxitud en el mantenimiento del récord médico. Hemos de insistir. Ello mengua su efectividad como instrumento útil para informar con exactitud el cumplimiento de las órdenes del médico, y como fuente de referencia para la evaluación del tratamiento, la atención y cuidado administrado al paciente. *López v. Hosp. Presbiteriano, Inc.*, supra, págs. 216-217. Más aún, hemos atribuido consecuencias jurídicas a dicha omisión "[e]n vista de la falta casi total de credibilidad que nos merecen los récords presentados en evidencia; en vista de que algunos de ellos fueron alterados; . . . éste es un caso en el cual corresponde hacer con respecto al hospital [una] inferencia de negligencia que hace aplicable la regla de *res ipsa loquitur*". *Oliveros v. Abréu*, 101 D.P.R. 209, 230 (1973). La falta de dichas anotaciones en el récord no necesariamente constituye negligencia per se. Sin embargo, dicha omisión puede ser factor a considerarse en la credibilidad que el médico merezca respecto al tratamiento que dio al paciente. *Reyes v. Phoenix Assurance Co.*, 100 D.P.R. 871, 880-881 (1972).

En admonición judicial reciente reiteramos que los hospitales deben ser especialmente celosos en vigilar que "sus medidas de evaluación periódica de la competencia profesional de sus médicos y en relación con el mantenimiento cuidadoso de los récords médicos sean de excelencia". *Núñez v. Cintrón*, 115 D.P.R. 598, 606 (1984).

En resumen, a la luz de los hechos expuestos e inferencias permisibles, el hospital fue negligente. *Soc. de Gananciales, Etc. v. Presbyterian Hosp.*, 88 D.P.R. 391, 401 (1963).

Se demostró por el actor, mediante la preponderancia de la evidencia, que la conducta negligente del doctor González fue el factor que con mayor probabilidad causó la muerte de Pérez Vargas. *Núñez v. Cintrón*, supra. Establecieron que su condición requería una atención médica especial, cuidadosa y exhaustiva.

La versión de los recurrentes de que éste no manifestó dolor y nunca expresó haber recibido golpe en el área

abdominal, no concuerda con la condición de un hombre que se "incrustó en el guía" como consecuencia del accidente, que sufrió fracturas de cinco costillas y laceración de dos pulgadas en el mesenterio. Estos hechos fueron comprobados clínicamente a través de la autopsia. Las declaraciones del Dr. Hostos Fernández Naranjo, del oficial de policía Palermo y del chofer de ambulancia merecen credibilidad. Son testigos sin interés personal en el caso. Fueron funcionarios públicos que incidentalmente descargaron su deber. Se limitaron a expresar lo que percibieron.

Por el contrario, el testimonio del doctor González y la enfermera nos causa una sensación de contradicción y vacío. Su relato se torna inverosímil desde la llegada misma del paciente caminando, consciente y comunicativo, presto a marcharse lo más pronto posible para seguir de fiesta. La prueba objetiva de los recurridos controvirtió dicha versión.

■ Por otro lado, los recurrentes aducen que el paciente había "bebido" y que tal hecho puede haber retardado la manifestación de síntomas por los efectos del alcohol. Rechazamos esa proposición. Las lesiones eran tan graves y múltiples que difícilmente esa condición podía ocultar el dolor. Estamos en el campo de la especulación, pues no surge prueba del récord de cuán afectado estaba. Hemos de inferir que la omisión en el récord médico sobre una condición de embriaguez apunta hacia una conclusión contraria. Una vez más el hospital y su médico nos dejan huérfanos de información. Solamente han descansado, si acaso, en una presunción de regularidad que fue controvertida y derrotada.

En apoyo de su teoría, el hospital argumenta que el paciente nunca manifestó queja o dolor en el área del abdomen. Aduce que ese hecho no se expresó en ninguno de los records médicos ni en la demanda original.(3) No tiene

---

(3) En cuanto a este argumento —omitir tal hecho en la demanda original— ello es inconsecuente. El Derecho Procesal moderno ha abandonado la teoría de que una demanda debe contener con lujo de detalles todos los hechos en que se funda la causa de acción.

razón. En cuanto a los records médicos, en el dispensario de Lajas, no había médico. La enfermera se limitó a recoger la impresión brindada por el cuñado de Pérez Vargas, que entendía que el dolor más fuerte era en el pecho. Lo mismo ocurrió con la esposa al manifestar los síntomas al Dr. Hostos Fernández Naranjo. En la primera visita al dispensario de Lajas no se practicó examen. No podía detectarse su verdadera condición. En la segunda el Dr. Hostos Fernández pudo percatarse del dolor en el área abdominal.

La omisión de tal hecho por el Hospital La Concepción no merece mayores comentarios. Pretenden impugnar la credibilidad de los familiares del paciente por su escaso conocimiento de la medicina e incapacidad para traducir e interpretar la sintomatología del paciente. Choca contra la más elemental noción de lo justo. Aun presumiendo que el paciente no manifestara queja o dolor en el área del abdomen —lo cual es altamente dudoso— la naturaleza del accidente y su impacto requerían una indagación suficiente de toda su condición. Exigía un historial y examen detallado que incluyera los eventos que precedieron al accidente y "no simplemente el área de mayor queja o incomodidad". Moseley, *op. cit.*, Vol. II, pág. 128. Cinco (5) costillas estaban astilladas. ¿Cómo armonizar los dolores que las mismas causan con el alegado examen practicado y negativo del doctor González? Moseley, *op. cit.*, págs. 77–79; Ballinger, Rutherford & Zuidema, *The Management of Trauma*, Filadelfia, N. B. Saunders Co., 1968, págs. 293–295; Watson-Jones, *Fracture and Joint Injuries*, Londres, Churchill Livingstone, 1976, págs. 166–168. Ninguna costumbre, práctica o norma ética puede soslayar el deber de adecuado examen. La profesión médica, personal paramédico y los hospitales existen para el bienestar de los pacientes, no viceversa. *Núñez* v. *Cintrón*, supra.

La conducta del doctor González se apartó de las normas de razonabilidad y prudencia que rigen el ejercicio de la

profesión médica. *Hernández* v. *La Capital*, 81 D.P.R. 1031, 1037-1038 (1960).

B—*El concepto de diagnóstico*

■ El diagnóstico como preámbulo al tratamiento médico constituye el elemento cardinal de la medicina. Toda aproximación judicial debe inquirir en cuanto a su *calidad, extensión y eficacia* como punto de partida para el problema planteado de la negligencia médico-hospitalaria.

Se acepta que no existe un examen físico completo perfecto. Por ello la metodología de la medicina moderna parte de varias premisas. Primero, un examen básico rutinario permitirá, de ordinario, identificar casi cualquier anormalidad significante. Identificada ésta, se procederá a inspeccionar en detalle el área que representa problemas. El propósito es detectar con el mayor grado de certeza posible el misterio de determinada dolencia, esto es, obtener un diagnóstico. Un buen método es aquel basado en una rutina lógica y ordenada. Al desarrollarse sistemáticamente este plan se logra economizar tiempo y minimizar el riesgo de error por omisión. La experiencia demuestra que son más los errores de este tipo que los de acción. 9 Cantor, *Traumatic Medicine and Surgery for the Attorney*, Washington, D.C., Butterworth, 1963, pág. 604. Claro está, no puede diagnosticarse una condición apropiadamente si no se tiene razón alguna para sospechar su existencia. A. R. Holder, *Medical Malpractice Law*, 2da ed., New York, J. Wiley & Sons, 1978, pág. 71.

■ Segundo, un diagnóstico correcto depende de dos factores importantes: recopilación y análisis de la información. El primero, acopio de datos, requiere del médico capacidad para obtener datos certeros mediante la entrevista médica, historial del paciente y el examen físico. El análisis conduce al objetivo perseguido mediante una evaluación lógica de la data ante sí. Este proceso demanda conocimientos abarcadores y nociones en esta rama del

saber. Reconocer sus propias limitaciones y saber cuándo referir un paciente a otro médico o acceder a cualquier consulta que éste o sus familiares interesen, es procedente y representa un curso de acción normal y contemplado del proceso. Sherman y Fields, *Guide to Patient Evaluation*, 3ra ed., New York, Medical Examination Pub. Co., 1978, pág. 335. El médico examinador puede desorientarse o simplemente no detectar anormalidades debido a falta de destreza, tiempo o por ausencia de claves atribuibles a un historial incompleto. Sharpe, Fiscina y Head, *Law and Medicine*, St. Paul, Minnesota, West Pub. Co., 1978, pág. 26. Por ende, el acopio negligente de información esencial es fuente que genera responsabilidad profesional en daños. Adametz, *Failure to Make Diagnostics Test*, 210 J.A.M.A. 213 (1969). La importancia del historial médico estriba en que sugiere áreas a ser escrutadas en el examen físico y establece las bases para iniciar posibles diagnósticos. Se puede obtener mediante un informe narrativo del paciente, familiar cercano o persona que lo conozca, comenzando desde el momento en que por última vez se sintió bien. Precisamente ese momento es el que debe servir como punto de partida para un interrogatorio meticuloso concerniente a la presencia o ausencia de síntomas o signos reveladores. Se requiere que se formulen todas las preguntas cuyas contestaciones muevan o permitan obtener toda la información necesaria y relevante. Es tarea investigativa cuyo éxito depende de múltiples factores, tales como edad del paciente, preparación, grado de precisión, capacidad para recordar y otros. No debe descansarse tan sólo en lo que suministra voluntariamente el paciente. Holder, *op. cit.*, pág. 72. Además de ese historial, se impone el uso auxiliar de pruebas rutinarias, sencillas y económicas de laboratorio para diagnosticar la condición de un paciente. Su omisión también puede ser motivo para incurrir en responsabilidad por negligencia. Holder, íbid., pág. 85.

 El doctor González no observó las buenas nor-

mas profesionales en el diagnóstico. No podía limitarse a realizar un examen ligero y darlo de alta sin retener al paciente para observación. *Rivera* v. *E.L.A.*, 99 D.P.R. 890, 899 (1971); *Morales* v. *Hosp. Matilde Brenes*, supra, págs. 193, 194. Ello le impidió percibir un diagnóstico total correcto. El daño causado "pudo razonablemente haberse previsto y evitado". *Hernández* v. *La Capital*, supra. Advertimos que en este caso los síntomas no eran obscuros (*obscure symptoms*) en que se puede caer, sin responsabilidad, por un error de diagnóstico. *Rivera* v. *E.L.A.*, supra, pág. 900. Aquí no se observó un grado razonable de cuidado al realizar un examen completo del paciente —*Morales* v. *Hosp. Matilde Brenes*, supra, pág. 194— ni "esfuerzo concienzudo", *Oliveros* v. *Abréu*, supra, pág. 227.

█ Los hechos reflejan un récord médico incompleto del "que no se desprende diagnóstico alguno, como tampoco aparecen consignadas las alegadas advertencias que el [doctor] supuestamente hiciera en el sentido de que [el] paciente regresara si continuaba la condición". *Morales* v. *Hosp. Matilde Brenes*, supra, pág. 191.(⁴)

---

(⁴) Carecen de mérito los errores relativos a que el tribunal de instancia permitiera la enmienda a la demanda en una etapa avanzada de los procedimientos y admitiera fotocopia del documento oficial de protocolo de autopsia, a pesar de que el patólogo no compareció para identificarlo.

Los autos reflejan que dicha autopsia, de carácter mandatorio, fue realizada por instrucciones del Ministerio Fiscal bajo la autoridad conferida por los Arts. 31 y 10 de la Ley Núm. 5 de 21 de noviembre de 1978 (18 L.P.R.A. secs. 851dd y 851i). Formaba parte del récord oficial de la A.C.A.A. El patólogo que la efectuó, Dr. Miguel A. Rivera Bonilla, estaba fuera de la jurisdicción de Puerto Rico. Véase *Pueblo* v. *Millán Meléndez*, 110 D.P.R. 171, 174-176 (1980).

En cuanto a la enmienda a la demanda, la amplia discreción concedida por las reglas procesales al tribunal de instancia le facultaban para adoptar dicha determinación. Su función de impartir justicia y descubrir la verdad lo requerían. Reglas 13.1 y 13.2 de Procedimiento Civil; Reglas 64(B)5, 65(A)(h) y 71 de las de Evidencia. Sobre las enmiendas a las alegaciones véanse: *Epifanio Vidal, Inc.* v. *Suro*, 103 D.P.R. 793, 795 (1975); *Srio. del Trabajo* v. *Vélez*, 86 D.P.R. 585, 589-590 (1962); *Gutiérrez et al.* v. *Foix et al.*, 23 D.P.R. 73, 75 (1915); *Fernández* v. *Pescay et al.*, 26 D.P.R. 808, 813-814 (1918).

## III

*Indemnizaciones*

Resta considerar la razonabilidad y corrección de las indemnizaciones concedidas.

El primer planteamiento versa sobre la suma de $2,500 otorgada a la viuda Norma I. Cruz Rodríguez, e igual cantidad a su hijo Alberto, como causas heredadas, por los sufrimientos que experimentó el causante Pérez Vargas antes de su deceso según la doctrina de *Vda. de Delgado* v. *Boston Ins. Co.*, 101 D.P.R. 598 (1973).

▬ Ciertamente la prueba estableció que Pérez Vargas estuvo sometido a intensos dolores desde el accidente hasta su muerte. Pero notamos que distinto a cuando esos sufrimientos son generados por la culpa de persona responsable, aquí no podemos atribuirle todos esos sufrimientos a la negligencia del hospital. Nacieron de un accidente automovilístico ajeno a la participación subsiguiente del médico González. Cuando llegó al hospital ya los padecía. Es razonable esperar que aun cuando hubiese recibido el mejor de los tratamientos, los dolores en mayor o menor grado los hubiese continuado padeciendo algún tiempo. Una intervención quirúrgica oportuna para sanar la laceración en el mesenterio, al igual que la curación de las cinco (5) costillas fracturadas, no hubiese eliminado el sufrimiento previo generado. Aunque estamos en un área sumamente especulativa, en estas circunstancias resultan más razonables las cuantías de $1,000 para cada reclamante por esta causa de acción. *Publio Díaz* v. *E.L.A.*, 106 D.P.R. 854, 872 (1978). Deberán reducirse de ese modo las mismas.

▬ También coincidimos con los demandados recurrentes en que la compensación concedida a la viuda e hijo ($60,000 y $25,000) por concepto de angustias mentales es altamente irrazonable. *Urrutia* v. *A.A.A.*, 103 D.P.R. 643, 647 (1975). El examen de sus testimonios, si bien refleja una huella profunda en sus vidas, no arroja unas peculiaridades

anímicas especiales que justifiquen las sumas adjudicadas. Con los reajustes que un evento así causa, han continuado viviendo con aparente normalidad. Esta interpretación no debe tomarse como menosprecio a la realidad y honestidad de sus sufrimientos. A pesar de la deferencia que merece al tribunal de instancia al determinar la cuantía de daños, considerando que la viuda recibió $10,000 de beneficios provenientes de la A.C.A.A., debemos reducir su compensación a $40,000 y a $15,000 la de su hijo Alberto. *Colón* v. *Municipio de Guayama*, 114 D.P.R. 193 (1983). A tono con el espíritu de la ley especial debe deducirse esa cuantía.

En cuanto al lucro cesante, el mismo se ajusta a las guías básicas establecidas en *Suro* v. *E.L.A.*, 111 D.P.R. 456 (1981). El tribunal de instancia computó a base de las tablas del Departamento del Trabajo Federal que una persona de 43 años tendría una expectativa de vida útil de 27 años. Es razonable. Utilizó las tablas de salario mínimo de dicho Departamento para proyectar el ingreso desde la fecha del accidente en adelante. Hizo una proyección futura con un incremento de 25 centavos anuales durante la vida útil de Pérez Vargas, a saber, 27 años, y extendió su capacidad productiva hasta los 70 años. Se restó un 33% por gastos propios visualizados durante su vida útil. Los demandantes recurridos dependían del causante. La oficial de reclamaciones de A.C.A.A., que estudió el caso de Pérez Vargas, declaró que éste tenía un historial de trabajo continuo. Consideramos razonable la partida concedida por este concepto. Sin embargo, esta sentencia debe ser notificada al Departamento de Hacienda, toda vez que el causante no rendía planillas de contribución sobre ingresos. *Suro* v. *E.L.A.*, supra.

■ La conducta del Hospital La Concepción fue temeraria. De hecho, el testimonio de sus peritos constituye, tal vez, la declaración que con mayor claridad configura su responsabilidad civil. La alteración del récord médico denota una actitud extrema de no aceptar responsabilidad. Se arriesgó a litigar un caso del que se desprendía prima facie

la negligencia del médico. Debe asumir, pues, la responsabilidad por sus actos. *Raoca Plumbing* v. *Trans World*, 114 D.P.R. 464 (1983).

Finalmente, con relación al error sobre el memorando de costas, basado en que el abogado omitió expresar que "según el leal saber y entender del reclamante o su abogado las partidas de gastos incluidos son correctas y todos los desembolsos eran necesarios para la tramitación del pleito", no se nos ha convencido de que ello haya afectado la legitimidad de las mismas. Tal inadvertencia no tiene la consecuencia de viciarlo de nulidad. Las palabras sustitutas utilizadas por el abogado que lo juró de que "esta parte tiene derecho a recobrar las costas incurridas" cumplen sustancial y satisfactoriamente con el espíritu de la Regla 44.1 de Procedimiento Civil.

En virtud de lo expuesto, *sujeto a las modificaciones ordenadas, se confirmará la sentencia dictada por el Tribunal Superior, Sala de Mayagüez, fechada 12 de julio de 1983.*

El Juez Presidente Señor Trías Monge concurre en el resultado sin opinión. El Juez Asociado Señor Rebollo López disiente y se reserva el derecho a emitir opinión a esos efectos.