Estado Libre Asociado de Puerto Rico
TRIBUNAL DE APELACIONES
Panel VIII

| | | |
|---|---|---|
| HOSPITAL ESPAÑOL AUXILIO MUTUO DE PUERTO RICO<br>Recurrido<br><br>v.<br><br>CHRISTOPHER ALEMÁN ARCE<br>Peticionario | KLCE202500600 | *Certiorari* procedente del Tribunal de Primera Instancia, Sala de San Juan<br><br>Caso Núm. SJL284-2025-5276<br><br>Sobre:<br>Ley 284-1999, Ley Contra el Acecho en Puerto Rico, según enmendada por la Ley Núm. 99-2016 |

Panel integrado por su presidente, el Juez Rivera Colón, el Juez Adames Soto y la Jueza Santiago Calderón

Adames Soto, Juez Ponente

### RESOLUCIÓN

En San Juan, Puerto Rico, a 20 de agosto de 2025.

Comparece el señor Christopher Alemán Arce (señor Alemán Arce o peticionario), a través de un recurso de *certiorari,* en el que solicita la revocación de la Orden de Protección Final expedida en su contra el 28 de abril de 2025, por el Tribunal de Primera Instancia, Sala de San Juan, (TPI). La referida Orden de Protección fue solicitada por el Hospital Español Auxilio Mutuo de P.R. Inc. (Auxilio Mutuo o recurrido), en su carácter de patrono.

Examinada la totalidad del expediente, junto al derecho aplicable, decidimos *denegar* expedir el recurso solicitado.

## I. Resumen del tracto procesal

El 31 de enero de 2025, el Hospital Auxilio Mutuo peticionó una Orden de Protección al amparo de la Ley Núm. 284-1999, 33 LPRA sec. 4013 *et seq.*, contra el señor Alemán Arce, quien es enfermero y empleado del hospital. Esencialmente, se le imputó incurrir en un patrón de hostigamiento contra la señora María Vega (señora Vega),

también empleada de Auxilio Mutuo, consistente en que, el 28 de enero de 2025, protagonizó un incidente en el hospital donde el peticionario estaba alterado, fue hostil hacia los empleados, propició insultos y amenazas. Además, fue afirmado que, aunque al peticionario se le advirtió que no podía regresar al hospital, al siguiente día de los hechos narrados regresó, y nuevamente tuvo un altercado, y de igual forma hizo el 31 de enero de 2025, acudiendo por tercera vez.

Tras un análisis de los hechos, el TPI expidió la Orden de Protección Patronal solicitada, junto al desarme del peticionario. También dispuso que Orden estaría vigente por un término de seis (6) meses, desde el 28 de abril de 2025, hasta el 28 de octubre de 2025. En su resolución foro recurrido realizó la siguiente enumeración de hechos:

PARTE PETICIONARIA COMPARECE REPRESENTADA POR EL LCDO. GUILLERMO A. BARALT MIRÓ, RUA 20479.

PARTE PETICIONADA COMPARECE REPRESENTADA POR LA LCDA. CARMEN L. SOTO TELLADO, RUA 16061.

EN EVENTO DEL 20 ENERO 2025, PETICIONADO SE PERSONÓ EN LA OFICINA DE RECURSOS HUMANOS PARA SOLICITARLE UNA INFORMACIÓN A LA SRA. MARÍA VEGA, DIRECTORA DE LA OFICINA DE RECURSOS HUMANOS. LA SRA. VEGA LE INDICÓ AL PETICIONADO QUE NO PODÍA BRINDARLE LA INFORMACIÓN EN ESE MOMENTO Y QUE LO IBA A CONSULTAR.

ASÍ LAS COSAS, PETICIONADO SE ALTERÓ Y DE MANERA HOSTIL COMENZÓ A VERBALIZAR A LA SRA. VEGA QUE NO SABIA HACER SU TRABAJO, QUE ES RESPONSABLE DE QUE LAS COSAS ESTÉN ASÍ EN EL HOSPITAL, QUE IRÍA HASTA LAS ÚLTIMAS CONSECUENCIAS, QUE TIENE UN HERMANO QUE ES AGENTE FEDERAL Y QUE LO IBA A LLAMAR, MIENTRAS VERBALIZABA ESTAS COSAS, PETICIONADO SE LE ACERCÓ A LA SRA. VEGA. ADEMÁS, DABA GOLPES CON SUS NUDILLOS EN EL MOSTRADOR DEL ÁREA DE RECEPCIÓN.

EN ESE MOMENTO, LA SRA. VEGA LE PIDIÓ AL PETICIONADO QUE DEBÍA ABANDONAR LA OFICINA. LA SRA. VEGA LE INDICÓ AL PETICIONADO QUE ESTABA SUSPENDIDO DEL EMPLEO HASTA NUEVO AVISO.

POR ESTE EVENTO SE ACTIVÓ LA CLAVE GRIS EN EL HOSPITAL.

EL 29 DE ENERO 2025, PETICIONADO SE PERSONÓ A LA CLÍNICA DE EMPLEADOS DEL HOSPITAL Y VERBALIZÓ QUE NO TENÍA NADA QUE PERDER, PERO QUE LA SRA. VEGA Y EL SR. JAFET DÍAZ PÉREZ, GERENTE DE SEGURIDAD, SÍ

TENÍAN MUCHO QUE PERDER. ADEMÁS, VERBALIZÓ QUE LA SRA. VEGA ERA UNA ABUSADORA.

EL 31 DE ENERO 2025, PETICIONADO ACUDIÓ AL "LOBBY" PRINCIPAL DEL HOSPITAL.

PARTE PETICIONARIA TEME POR SU SEGURIDAD

SE CONCEDE ORDEN DE PROTECCIÓN FINAL POR 6 MESES. SE ORDENA DESARME.

PARTE PETICIONARIA NO LE PROHIBIRÁ LA ENTRADA AL HOSPITAL A PETICIONADO EN LOS SIGUIENTES ESCENARIOS:

1. QUE NECESITE ATENCIÓN MÉDICA DE EMERGENCIA EN LA SALA DE EMERGENCIAS.

2. CUANDO REQUIERA HOSPITALIZACIÓN.

3. QUE TENGA ALGUNA CITA MÉDICA CON ALGÚN MÉDICO DE LA TORRE MÉDICA. EN ESE CASO, PETICIONADO DEBERÁ PRESENTAR EVIDENCIA ESCRITA QUE ASÍ LO ACREDITE.

Inconforme, el Sr. Alemán Arce recurre ante este Tribunal de Apelaciones, y señala la comisión de los siguientes errores:

*Primer error*: El TPI actuó con perjuicio o parcialidad, craso abuso de discreción y error manifiesto al no aplicar el concepto **"acecho"** según lo define el Artículo 3(a) según los parámetros y definiciones establecidos y mencionados en la Ley 284 para configurarse los elementos constitutivos de acecho.

*Segundo error:* El TPI actuó con perjuicio o parcialidad, craso abuso de discreción y error manifiesto al no aplicar el concepto **"repetidamente"** según lo define el Artículo 3(b) según los parámetros y definiciones establecidos y mencionados en la Ley 284 para configurarse los elementos constitutivos de acecho.

*Tercer error*: El TPI actuó con perjuicio o parcialidad, craso abuso de discreción y error manifiesto al no aplicar el concepto **"intimidar"** según lo define el Artículo 3(a) según los parámetros y definiciones establecidos y mencionados en la Ley 284 para configurarse los elementos constitutivos de acecho.

Por tanto, examinado el expediente recurso de epígrafe, y en atención a la determinación arribada, determinamos resolver sin la comparecencia de la parte recurrida. Regla 7(B)(5) del Reglamento del Tribunal de Apelaciones, 4 LPRA Ap. XXII-B. R. 7(B)(5).

## II.   Exposición de Derecho

### a. Ley Contra el Acecho en Puerto Rico (Ley Núm. 284-1999)

El 21 de agosto de 1999, nuestra Asamblea Legislativa aprobó la Ley Número 284 de dicho año, 33 LPRA Sec. 4013, *et seq.*, mejor conocida como la *Ley contra el acecho en Puerto Rico* (Ley 284-1999). Según definido por dicho estatuto, "acecho" significa una conducta mediante la cual se ejerce una vigilancia sobre determinada persona; se envían comunicaciones verbales o escritas no deseadas a una determinada persona, se realizan amenazas escritas, verbales o implícitas a determinada persona, se efectúan actos de vandalismo dirigidos a determinada persona, se hostiga repetidamente mediante palabras, gestos o acciones dirigidas a intimidar, amenazar o perseguir a la víctima o a miembros de su familia. 33 LPRA sec. 4013.

El inciso "a" del Artículo 4 del estatuto examinado establece que; "[t]oda persona que intencionalmente manifieste un patrón constante o repetitivo de conducta de acecho dirigido a intimidar a una determinada persona a los efectos de que ella, o cualquier miembro de su familia podría sufrir daños, en su persona o en sus bienes; o que mantenga dicho patrón de conducta a sabiendas de que determinada persona razonablemente podría sentirse intimidada incurrirá en delito menos grave."

La Ley 284-1999 autoriza a los tribunales a emitir una orden de protección a favor de cualquier persona que haya sido víctima de acecho, o conducta constitutiva del delito, según tipificado en dicha ley, en el Código Penal de Puerto Rico o en cualquier otra ley especial. 33 LPRA Sec. 4015. Dicha orden podrá ser peticionada por la alegada víctima, quien deberá presentar por sí, por conducto de su representante legal o por un agente del orden público, una petición en el tribunal solicitando una orden de protección, sin que sea necesario la prestación previa de una denuncia o acusación. Tal petición, también podrá ser presentada por un patrono a favor de un empleado

o una empleada si: (1) dicho empleado o empleada es o ha sido víctima de acecho o de conducta constitutiva de delito según tipificado en esta Ley; y (2) los actos constitutivos de acecho han ocurrido en el lugar de trabajo de dicho empleado o empleada o en las inmediaciones de dicho lugar de trabajo. *Íd.*

Cuando el tribunal determine que existen motivos suficientes para creer que quien acude ante dicho foro ha sido víctima de acecho, podrá emitir una orden de protección en la que podrá ordenarle a la persona contra la que se emite dicha orden a que:

a. entregue a la Policía de Puerto Rico para su custodia, bien sea con carácter temporero, indefinido o permanente, cualquier arma de fuego sobre la cual se le haya expedido una licencia de tener o poseer de portación y tiro al blanco o ambas. Además, según fuere el caso, ordenará la suspensión de la licencia de armas del querellado bajo los mismos términos.

b. Se abstenga de:

i. molestar, hostigar, perseguir, intimidar, amenazar, o de cualesquiera otras formas constitutivas bajo esta Ley de acecho, a la parte a favor de la que se emitió la orden.
ii. penetrar en cualquier lugar donde se encuentre la parte a favor de la que se emitió la orden, cuando a discreción del tribunal dicha limitación resulte necesaria para prevenir que se moleste, intimide, amenace o de cualquier otra forma se aceche y/o se interfiera con la parte a favor de la que se emitió la orden y/o un miembro de su familia.

c. Pague a la parte a favor de la que se emitió la orden una indemnización por los daños que fueren causados por la conducta constitutiva de acecho, la que podrá incluir, pero no estará limitada a compensación por gastos de mudanza, gastos por reparaciones a la propiedad, gastos legales, gastos médicos y siquiátricos, gastos de sicólogos y de consejería, orientación, alojamiento, y otros similares, sin perjuicio de otras acciones civiles a las que tenga derecho la parte peticionaria.

d. desaloje la residencia que comparte con la parte a favor de la que se emitió la orden, independientemente del derecho que reclame sobre la misma. Podrá el tribunal también disponer sobre cualquier medida provisional respecto a la posesión y uso de la residencia de la que se haya ordenado el desalojo y los bienes muebles que se encuentren en esta; ordenar al dueño o encargado de un establecimiento residencial del que se haya ordenado el desalojo a tomar las medidas necesarias para que no se viole la orden emitida por el

tribunal; y, emitir cualquier orden necesaria para dar cumplimiento a los propósitos y política pública de esta Ley. Art. 5(c) de la Ley 284-1999.

En cuanto al proceso específico para la expedición de una orden de protección, el Artículo 6 de la Ley 284-1999, 33 LPRA Sec. 4016, establece que este comenzará (1) mediante la presentación de una petición verbal o escrita; (2) dentro de cualquier caso pendiente entre las partes; (3) a solicitud del Ministerio Fiscal en un procedimiento penal; o (4) como una condición para disfrutar de sentencia suspendida o libertad condicional. Presentada la petición de orden de protección, el tribunal expedirá una citación a las partes bajo apercibimiento de desacato para una comparecencia dentro de un término no mayor de cinco (5) días. La notificación de tal citación deberá efectuarse conforme las Reglas de Procedimiento Civil. La incomparecencia de una persona debidamente citada será condenable como desacato criminal al tribunal que expidió la citación. *Íd.*

Cabe señalar que los tribunales, también pueden emitir una orden de protección de forma *ex parte,* cuando: (1) se han hecho las gestiones de forma diligente para notificar a la parte peticionada con copia de la citación expedida por el tribunal y de la petición presentada ante el tribunal, sin tener éxito; (2) existe la probabilidad de que dar la notificación previa a la parte peticionada provocará el daño irreparable que se intenta prevenir al solicitar la orden de protección, o (3) cuando la parte que solicita la orden de protección demuestre que existe una probabilidad sustancial de un riesgo inmediato a su seguridad y/o la de algún miembro de su familia. 33 LPRA Sec. 4017.

### b. Apreciación de la prueba

Según es sabido, la fase apelativa está caracterizada por la norma de deferencia judicial que mostramos al ejercicio de aquilatar credibilidad que efectúa el tribunal *a quo* al sopesar la prueba testifical. Esta norma arranca de la premisa de que es el foro primario el que está en mejor posición para evaluar y adjudicar la credibilidad

de los testigos. *SLG Rivera Carrasquillo v. AAA*, 177 DPR 345, 356 (2009). Para ello, se tuvo la oportunidad de escuchar y ver declarar los testigos *López v. Dr. Cañizares,* 163 DPR 119, 136 (2004). Después de todo, el "foro apelativo cuenta solamente con récords mudos e inexpresivos", de ahí el respeto a la adjudicación de credibilidad realizada por el foro primario. *SLG Rivera Carrasquillo v. AAA*, supra. Véase, además, *Trinidad v. Chade*, 153 DPR 280, 291 (2001); *Pérez Cruz v. Hosp. La Concepción*, 115 DPR 721, 728 (1984).

Los foros apelativos no deben intervenir con la apreciación de la prueba realizada por el Tribunal de Primera Instancia, a menos que se demuestre que medió pasión, prejuicio, parcialidad o error manifiesto del foro primario. *Sucn. Rosado v. Acevedo Marrero*, 196 DPR 884, 917 (2016); *Dávila Nieves v. Meléndez Marín,* 187 DPR 750 (2013); *Rivera Menéndez v. Action Service*, 185 DPR 431, 444 (2012); *SLG Rivera Carrasquillo v. AAA,* supra; *Rodríguez v. Urban Brands,* 167 DPR 509, 522 (2006).

Para que un foro revisor revoque las determinaciones de hechos realizadas por el TPI, la parte que las cuestione deberá demostrar y fundamentar que medió pasión, prejuicio, parcialidad o error manifiesto por el juzgador. *SLG Rivera Carrasquillo v. AAA,* supra. Véase, además, *Flores v. Soc. de Gananciales,* 146 DPR 45, 49 (1998). Se podrá intervenir con estas conclusiones cuando la apreciación de la prueba no represente el balance más racional, justiciero y jurídico de la totalidad de la prueba. *González Hernández v. González Hernández*, 181 DPR 746, 777 (2011).

Esto quiere decir que un tribunal revisor podrá intervenir con la apreciación de la prueba cuando de un examen detenido de la misma quede convencido de que el juzgador descartó injustificadamente elementos probatorios importantes o que fundamentó su criterio únicamente en testimonios de escaso valor, o inherentemente

improbables o increíbles. *C. Brewer P.R., Inc. v. Rodríguez,* 100 DPR 826, 830 (1972)*; Pueblo v. Luciano Arroyo,* 83 DPR 573, 581 (1961).

**III. Aplicación del Derecho a los hechos**

a.

Según lo revelan los señalamientos de error alzados, el peticionario cuestiona asuntos relativos a la apreciación de la prueba efectuada por el TPI, y su suficiencia respecto a los elementos que el estatuto sobre Órdenes de Protección requiere que sean probados para ser expedida. Es decir, la consideración del escrito presentado por el peticionario nos requiere auscultar la prueba testifical que desfiló ante el foro *a quo,* y con este propósito dicha parte nos proveyó la grabación de la vista. Realizado tal ejercicio, a continuación, plasmamos datos obtenidos de la prueba testifical allí desfilada.

El 28 de enero de 2025, el peticionario acudió a las oficinas de recursos humanos de Auxilio Mutuo procurando a la señora Lissette González.[1] Dado a que la señora González se encontraba reunida, este se mostró un poco impaciente;[2] por lo que la señora Vega procedió a atenderlo.[3] A pesar de haber solicitado la información de la licenciada en otras ocasiones, esta le indicó que, en ese momento, no podía divulgar los datos.[4] Ante esta respuesta, el señor Alemán Arce se molestó y comenzó a vociferar palabras en contra de su persona tales como: "usted no hace su trabajo"; "es irresponsable"; "usted es la culpable de que las cosas estén así en el hospital".[5] **La señora Vega describió que el peticionario la señaló y comenzó a acercarse, a una distancia que a su juicio fue preocupante**.[6] A esta le resultó irrazonable la manera en la que el peticionario se expresaba sobre su persona.[7] Además, sentía temor ya que conocía que el peticionario

---

[1] Regrabación de la vista del 28 de abril de 2025, minuto 4:08.
[2] *Íd.,* minuto 4:25.
[3] *Íd.,* minuto 4:50.
[4] *Íd.,* minuto 5:00.
[5] *Íd.,* minuto 5:15.
[6] *Íd.,* minuto 5:40.
[7] *Íd.,* minuto 6:07.

tenía licencia de portación de armas, sin embargo, no podía precisar si este llevaba el arma en su persona.[8] Aunque la señora Vega le solicitó que se fuera de la oficina, el peticionario insistió en permanecer en las instalaciones.[9] Dado a que el personal a su alrededor se comenzó a preocupar por la situación, se activó la clave gris.[10] La señora Vega explicó que la clave gris se utiliza cuando hay violencia en el trabajo.[11] Nuevamente, esta le solicitó al peticionario que se retirara.[12] A modo de respuesta, la seguridad del hospital llegó hasta las oficinas de recursos humanos.[13] La señora Vega describió que al personal de seguridad se les dificultó escoltar al señor Alemán Arce fuera de las instalaciones. Al observar lo que describió como un "manoteo", la señora Vega se acercó a la puerta y le indicó al peticionario que no podía regresar al hospital hasta nuevo aviso.[14] Cabe señalar que esto se tomó como una medida cautelar para evitar otro incidente.[15]

La señora Vega detalló que al día siguiente, el señor Alemán Arce regresó al hospital a pesar de la instrucción .[16] La clínica de empleados se comunicó para notificarle que este se encontraba presente en las facilidades.[17] Las instrucciones del personal fue contactar a seguridad.[18] Cabe señalar que, la señora Vega se mantuvo en la llamada telefónica y **escuchó todo lo que el señor Alemán Arce vociferaba en contra de su persona**.[19] Consideró que esto consistía en un ataque personal e hizo referencia a las amenazas que este realizó en cuanto a que su hermano "es federal" y que esta vería las

---

[8] *Íd.,* minuto 6:14.
[9] *Íd.,* minuto 6:30.
[10] *Íd.,* minuto 6:50.
[11] *Íd.,* minuto 6:58.
[12] *Íd.,* minuto 7:04.
[13] *Íd.,* minuto 7:10.
[14] *Íd.,* minuto 7:20 y 7:57.
[15] *Íd.*
[16] *Íd.,* minuto 8:14.
[17] *Íd.,* minuto 8:20.
[18] *Íd.,* minuto 8:38.
[19] *Íd.,* minuto 8:50.

consecuencias. [20] La señora Vega describió que se sintió muy intimidada, preocupada y aumentó su inseguridad. [21] Comentó que asignaron personal de seguridad a su oficina y se cambiaron las cerraduras de la misma. [22]

Por último, la misma testigo indicó que el peticionario acudió dos (2) días más tarde a las instalaciones. [23] Especificó que la seguridad intervino con el peticionario en el área del "lobby". [24] A la señora Vega se le instruyó que debía quedarse en su oficina como medida de seguridad. [25]

Sobre el día 28 de enero de 2025, la señora Lissette González Pagán (señora González), gerente de recursos humanos, declaró que esta se encontraba en una reunión durante el incidente. [26] Detalló que, mientras el peticionario conversaba con la señora Vega, este se encontraba alterado. [27] Específicamente, **describió que este golpeaba con sus nudillos en el escritorio que ubica en el área de la recepción**. [28] La señora González aclaró que una de sus compañeras activó la clave gris. [29]

El día 29 de enero de 2025, la señora González presenció cuando la señora Vega se encontraba escuchando la conversación de lo que ocurrió en la clínica de empleados. [30] De este particular, informó que escuchó al peticionario decir que quería que la señora Vega lo atendiera, entre otras cosas de las cuales no recordó las palabras exactas. [31] Indicó que, luego de la activar la clave gris, se cambiaron las cerraduras de las oficinas y se asignó a personal de seguridad

---

[20] *Íd.,* minuto 8:54.
[21] *Íd.,* minuto 9:14.
[22] *Íd.*
[23] *Íd.,* minuto 9:49.
[24] *Íd.*
[25] *Íd.,* minuto 10:00.
[26] *Íd.,* minuto 32:00.
[27] *Íd.,* minuto 33:02.
[28] *Íd.,* minuto 33:06.
[29] *Íd.,* minuto 33:25.
[30] *Íd.,* minuto 34:48.
[31] *Íd.,* minuto 35:15.

"encubierto" al área de recursos humanos.[32] Por último, sobre el 31 de enero de 2025, manifestó que tuvo conocimiento del incidente, pero no estuvo presente.[33]

Del testimonio del señor Jafet Díaz Pérez (señor Díaz) surge que el 28 de enero de 2025, recibió una llamada para que se personara a la oficina de recursos humanos debido a una clave gris.[34] Informó que, normalmente, estas claves son atendidas por el personal de seguridad, por lo que se mantiene en su oficina.[35] En esta ocasión, al recibir la llamada de la señora Liliana Reyes, salió de su oficina para atender la situación.[36] Al llegar al área de recursos humanos, observó la puerta abierta y describió que el señor Alemán Arce se encontraba alterado.[37] El señor Díaz le solicitó al peticionario que no se dirigiera hacia la señora Vega.[38] Lo intentó dirigir hacia afuera para continuar la conversación, pero el peticionario se mantuvo arremetiendo contra la señora Vega para que le diera la información solicitada.[39] El señor Díaz le solicitó en dos (2) ocasiones que se retirara de las instalaciones.[40] Una vez afuera, el peticionario manifestó que "la señora Vega era una abusadora", "que por esto el hospital estaba como estaba", "que la señora Vega fue la culpable de que el empleado se quitara la vida".[41] Una vez en el área de la escalera, la señora Vega le notificó al peticionario que estaba suspendido y que no regresara al hospital hasta nuevo aviso.[42] **Ante esto, el señor Alemán Arce se tornó agresivo y se lanzó hacia la señora Vega, no obstante, el señor Díaz interpuso su mano para prevenir que este la alcanzara**.[43] Nuevamente se le solicitó que se retirara de la institución, sin embargo,

---

[32] *Íd.,* minuto 35:37.
[33] *Íd.,* minuto 36:27.
[34] *Íd.,* minuto 48:16.
[35] *Íd.,* minuto 48:42.
[36] *Íd.,* minuto 48:48.
[37] *Íd.,* minuto 49:06.
[38] *Íd.,* minuto 49:36.
[39] *Íd.,* minuto 49:47.
[40] *Íd.,* minuto 50:06.
[41] *Íd.,* minuto 50:13.
[42] *Íd.,* minuto 51:00.
[43] *Íd.,* minuto 51:08.

el peticionario se mantuvo en la acera y manifestó amenazas de que tiene un hermano que es federal, que tanto el señor Díaz como la señora Vega verían lo que este haría.[44] Alegó que el peticionario simuló estar grabando mientras decía que estos tenían un abuso en su contra y no lo dejaban entrar.[45] La seguridad escoltó al señor Alemán Arce hasta su vehículo y este se marchó.[46]

Al siguiente día, recibió una llamada de la clínica de empleados notificándole que el peticionario se encontraba en el área.[47] Mientras se dirigía a la clínica, solicitó la compañía de uno de sus empleados y notificó por su radio que había una clave gris.[48] Al llegar, observó al peticionario, quien le indicó que acudió para hacer la lectura de la tuberculina.[49] La señora Marysol Quiñones le indicó al peticionario que se retirara, toda vez que ya había terminado con el análisis.[50] El peticionario manifestó que les estaría haciendo una querella, que su hermano era un agente federal.[51] **Mientras el peticionario se estaba retirando, este se giró y expresó :"yo no tengo nada que perder, tú y María Vega, sí".**[52] Nuevamente se escoltó al peticionario hasta la salida.[53] Sobre el 31 de enero de 2025, el señor Díaz se encontraba ausente por enfermedad.[54] Sin embargo, se le notificó sobre la aparición del peticionario en las instituciones.[55]

b.

Según adelantamos, el peticionario aduce que incidió el TPI en su dictamen, al no ajustarse a aplicar los parámetros que establece la Ley 284-1999 cuando define lo que constituye *acecho, intimidación y*

---

[44] *Íd.,* minuto 51:15.
[45] *Íd.,* minuto 51:40.
[46] *Íd.,* minuto 51:58.
[47] *Íd.,* minuto 52:10.
[48] *Íd.,* minuto 52:40.
[49] *Íd.,* minuto 53:19.
[50] *Íd.,* minuto 53:25.
[51] *Íd.,* minuto 53:30.
[52] *Íd.,* minuto 53:45.
[53] *Íd.,* minuto 54:00.
[54] *Íd.,* minuto 54:15.
[55] *Íd.,* minuto 54:20.

*repetidamente*. Juzgamos que los tres señalamientos de error son susceptibles de discusión conjunta, por lo que así obraremos.

Tal como advertimos en la exposición de derecho, cabe recordar aquí que existen diferentes manifestaciones de lo que constituye *acecho*, entre las cuales está la vigilancia y las amenazas escritas, verbales o implícitas. Sobre estas, no resulta necesario que cada manifestación esté presente, sino que bastará que se incurra en cualquiera de ellas. En lo particular, para que se configure el acecho, la conducta realizada debe: (1) ser intencional; (2) haberse repetido (mínimamente en dos instancias separadas); (3) constituir acecho, según lo define el estatuto; (4) estar dirigida hacia una persona determinada, y; (5) tener la finalidad de intimidar a dicha persona o a un familiar de esta.

Según mencionamos, el concepto *intimidar* bajo este estatuto refiere al acto o palabra manifestado repetidamente, que infunde temor en el ánimo de una persona prudente y razonable a los efectos de que este, o cualquier miembro de su familia, pueda sufrir daños a su persona o sus bienes. Al enfrentar tal definición con la prueba testifical que tuvo ante sí el foro primario, no observamos atisbo de insuficiencia de prueba, mucho menos que hubiese intervenido el prejuicio, parcialidad, pasión o error manifiesto que nos habilitarían para interponernos con el ejercicio valorativo efectuado por el foro primario sobre la prueba testifical. Con mayor precisión, no estamos en posición de intervenir con el dictamen recurrido en tanto carecemos de los elementos para hallar prejuicio, parcialidad o pasión en la determinación de que las palabras y expresiones del peticionario tuvieron el propósito, precisamente, de intimidar al personal de Auxilio Mutuo, específicamente, a la señora Vega, además, durante más de un día.

Sobre esto último, atendiendo el requerimiento estatutario de que la conducta imputada haya acontecido *repetidamente*, su acepción

jurídica requiere que esta hubiese ocurrido en dos ocasiones – separadas - o más. Una vez más, examinados los testimonios de los testigos que desfilaron ante el foro primario, no nos causa mayor dificultad identificar que, en efecto, el peticionario acudió al hospital en dos ocasiones o más, el 28, 29 y 31 de enero de 2025, a pesar de tener en su contra una suspensión que le prohibía regresar hasta nuevo aviso.

En definitiva, no apreciamos que concurran las causas que justifiquen nuestra intervención con la determinación recurrida, ni nos persuade el peticionario al solicitar subvertir la Orden de protección concedida, cuando el sopesar la prueba testifical en este caso tenía tanto peso, carga mayoritariamente asumida por el foro de instancia, en ausencia de circunstancias que nos habiliten en contrario.

## IV. Parte dispositiva

Por los fundamentos antes expuestos, *denegamos* expedir el recurso de *certiorari* solicitado.

Lo pronunció y manda el Tribunal y lo certifica su Secretaria.

Lcda. Lilia M. Oquendo Solís
Secretaria del Tribunal de Apelaciones