Estado Libre Asociado de Puerto Rico
TRIBUNAL DE APELACIONES
PANEL VI

| | | |
|---|---|---|
| PEDRO JOSÉ CRUZ AMADEO<br><br>Apelado<br><br>v.<br><br>BELLA INTERNATIONAL, LLC Y OTROS<br><br>Apelantes | KLAN202301145 | *APELACIÓN* procedente del Tribunal de Primera Instancia, Sala Superior de San Juan<br><br>Caso núm.: SJ2022CV00328 (903)<br><br>Sobre: Despido Injustificado (Ley núm. 80) y otros |

Panel integrado por su presidenta la jueza Ortiz Flores, el juez Rivera Torres, la jueza Rivera Pérez y el juez Campos Pérez.

**Rivera Torres, Juez Ponente**

### SENTENCIA

En San Juan, Puerto Rico, a 31 de mayo de 2024.

Comparece ante este tribunal apelativo la corporación Bella International, LLC (BI o la apelante), mediante el recurso de *Apelación* de epígrafe donde nos solicita que revoquemos la *Sentencia* emitida por el Tribunal de Primera Instancia, Sala Superior de San Juan (TPI), el 11 de diciembre de 2023, notificada al día siguiente. Mediante este dictamen, el foro primario declaró *Ha Lugar* a una *Querella* presentada por el Sr. Pedro José Cruz Amadeo (señor Cruz Amadeo o el apelado) e impuso a la apelante el pago de la mesada de $34,000, más un 25% en honorarios de abogado.

Por los fundamentos que expondremos a continuación, confirmamos el dictamen apelado.

### I.

El 19 de enero de 2022, el señor Cruz Amadeo presentó ante el TPI una *Querella* por motivos de despido injustificado donde alegó que, el 3 de noviembre de 2021, fue despedido de forma abrupta, fulminante, inmediatamente, sin el debido proceso de ley y sin justa

causa.[1] Por ende, reclamó una mesada de tres meses de sueldo equivalente a $34,035.48 más la cantidad correspondiente al 25% de honorarios de abogado equivalente a $8,508.87.[2]

El 3 de febrero de 2022, BI presentó su Contestación a la Querella, en la cual negó los hechos esbozados por el señor Cruz Amadeo y levantó defensas afirmativas.[3]

Inicialmente dicha *Querella* fue radicada contra las partes Bella International, LLC; Bella Auto Group, LLC; Bella Retail Group, LLC; Bella Group, LLC y Bella Group del Este, LLC.[4] No obstante, luego de un desistimiento de parte del señor Cruz Amadeo en cuanto a unas partes que estuvieron inicialmente incluidas en la *Querella*, el TPI dictó una *Sentencia Parcial* declarando el desistimiento sin perjuicio en cuanto a aquellas.[5] A raíz de este dictamen, la única causa de acción pendiente es contra la aquí apelante.[6]

El juicio en su fondo consistió en seis (6) vistas plenarias celebradas los días 1, 2, 3, 6, 8 y 9 de noviembre de 2023.[7] Durante estos días, declararon los siguientes siete (7) testigos:

1. El querellante, el señor Cruz Amadeo.

2. El CEO de Bella International, LLC, Sr. Carlos López-Lay.

3. La Vicepresidenta de Recursos Humanos, Sra. Daisy Rodríguez.

4. El Vicepresidente de piezas y servicio, Sr. José Medina.

5. La Directora de Finanzas, Sra. Cecilia Rivera.

6. El Vicepresidente de Finanzas, Sr. David Ayala

7. La "System Manager", Sra. Mayleen García.

A continuación, resumimos los testimonios relevantes a la controversia.

---

[1] Véase, Apéndice XIV del Recurso, a las págs. 673-675.
[2] *Íd.*
[3] Véase, Apéndice XIII del Recurso, a las págs. 668-672.
[4] Véase, Apéndice XIV del Recurso, a las págs. 673-675.
[5] Véase, Apéndice XII del Recurso, a la pág. 667.
[6] *Íd.*
[7] Véase, Apéndice I del Recurso, a la pág. 5.

**Sr. Pedro José Cruz Amadeo**

Sobre lo que nos concierne en este caso, el querellante comenzó testificando sobre su historial de empleo incluyendo su llegada a BI en el 2014 al iniciar como vendedor de autos.[8] Este testificó sobre su trayectoria laboral hasta cuando fungió como Gerente de Servicios, las sucursales a las que fue trasladado para desempeñar el cargo y su desempeño en las sucursales gerenciadas.[9] El señor Cruz Amadeo atestiguó que, mientras laboró como Gerente de Servicios en el establecimiento Honda de la Kennedy, el 3 de noviembre de 2021 recibió a una empleada nueva llamada Yaritza López a la cual llevó a su oficina para que fuera familiarizándose con el entorno de trabajo y le comentó que "...cualquier duda, cualquier asunto que ella tuviera..." que se lo dejara saber inmediatamente.[10] Mientras transcurrió el día, este declaró que se acercó en dos ocasiones, a las 11:00 am y 2:00 pm, a donde la empleada para asegurarse de que estaba todo en orden , a lo que ella le respondió que todo estaba bien.[11] Así las cosas, declaró que, alrededor de las 4:30 pm, recibió una llamada de la empleada Yaritza López informándole que había una cliente molesta.[12] Según este testificó, Yaritza López había pedido un DSM (el proceso para autorización del fabricante para poder reparar una pieza que tiene garantía) y no le habían contestado, al estar cerca de la hora de salida del técnico (5:00 pm) no hubiera sido posible una reparación, por lo que este le comentó a ella que haría las gestiones para conseguirle a la cliente un carro sustituto a lo que solucionaban el problema.[13]

---

[8] Véase, Transcripción de la Prueba Oral (TPO), 9 de noviembre de 2023, en las págs. 9-25.
[9] Véase, TPO, en las págs. 28-91.
[10] Véase, TPO, en la pág. 92.
[11] Véase, TPO, en las págs. 92-93.
[12] Véase, TPO, en la pág. 93.
[13] Véase, TPO, en las págs. 93-94.

El testigó expuso que, luego de finalizar su llamada con la empleada, se presentó a su oficina el Sr. Carlos López-Lay (señor López-Lay) dejándole saber que tenía una cliente molesta y preguntando quién citó ésta última.[14] Este le contestó que acababa de recibir una llamada informándole lo sucedido y que estaría resolviendo el asunto, por lo que procedió a realizar gestiones para conseguir un carro.[15] Así las cosas, luego de conseguir el vehículo, y después de que le identificaran quien era la cliente, el señor Cruz Amadeo declaró que se dirigió a donde ella estaba con el señor López-Lay, para atender el asunto, pero este último le respondió que él la atendería.[16] Declaró que se retiró y conversó con la empleada Yaritza López y ahí obtuvo más información de lo ocurrido con la cliente.[17] Según testificó, la cliente y él habían sostenido una conversación en donde le había comentado que pasara el lunes al taller para atender el asunto de una bomba de gasolina, pasaron unos días y no había llegado, por lo cual el 3 de noviembre de 2021, a las horas de la mañana, llegó y no le notificaron de la llegada de ésta al taller.[18]

Así las cosas, el señor Cruz Amadeo relató que el señor López-Lay entró a su oficina, le cuestionó nuevamente por la cliente y sin dejarle explicar lo sucedido le dice que no había excusas, que recogiera su oficina.[19] Luego de ese día fue contactado por la Sra. María Santiago de Recursos Humanos para que entregara el celular de la compañía, llaves y todo equipo perteneciente a la compañía. Según declaró este fue el único contacto que tuvo de parte de Recursos Humanos sobre el despido.[20]

---

[14] Véase, TPO, en la pág. 95.
[15] *Íd.*
[16] Véase, TPO, en la pág. 96.
[17] Véase, TPO, en las págs. 96-97.
[18] Véase, TPO, en la pág. 97.
[19] Véase, TPO, en la pág. 98.
[20] Véase, TPO en las págs. 99-112.

**Sr. Carlos López-Lay**

El señor López-Lay testificó que, el 3 de noviembre de 2021, llegó al establecimiento Honda de la Kennedy alrededor de las 4:30 pm y escuchó a una mujer gritando.[21] Según atestiguó, la cliente le comentó que estaba teniendo problemas con su carro y era la tercera vez que iba al servicio de Honda de la Kennedy y, además, que todavía no la habían atendido.[22] Así las cosas, el señor López-Lay se dirigió a la oficina del señor Cruz Amadeo y le dejó saber que tenía una cliente molesta que llevaba en el taller desde las horas de mañana, a lo que este le respondió que estaba resolviendo.[23] Declaró que, al salir de la oficina, regresó a donde estaba y al conversar con ella se enteró que estaba teniendo problemas con su carro, pues estaba oliendo a gasolina, que había tenido que ir al servicio de Honda de la Kennedy tres veces y que el señor Cruz Amadeo le dio una cita.[24] Testificó que, mientras conversaba con la cliente, el señor Cruz Amadeo se acercó y le dejó saber que estaría atendiendo la situación.[25]

El señor López-Lay relató que procedió a realizar gestiones para conseguirle a la cliente un carro sustituto y luego se dirigió a la oficina del señor Cruz Amadeo.[26] Al entrar a la oficina, le comentó que no había excusa para lo sucedido, y "[y]o digo: "Tienes toda la razón, no tienes excusas", "No, pero déjame explicar" y yo le digo: "Pedro, aquí no hay explicación que dar. Recoge tu oficina", y así fue que le dije que … que recogiera su oficina."[27] Mencionó que decidió despedirlo porque ya se le habían dado varias oportunidades durante los años en el área de ventas, financiamientos y gerencia en las diferentes sucursales de BI y "ciertamente el patrón y las … las

---

[21] Véase, TPO, del 2 de noviembre de 2023 en las págs. 18-22.
[22] *Íd.*, en las págs. 30-31.
[23] *Íd.*, en las págs. 31-32.
[24] *Íd.*, en la pág. 32.
[25] *Íd.*
[26] Véase, TPO del 2 de noviembre de 2023, en la pág. 33.
[27] *Íd.*

veces que nosotros tratamos de que esas oportunidades funcionaran habían llegado a un punto donde el daño que le estaba haciendo a la compañía, ya sea por la falta de conocimiento, negligencia o simplemente incapacidad de poder hacer su trabajo ...”[28] Además, testificó que optó en no suspenderlo, pues:[29]

> [p]orque llega un punto cuando tú tienes que confiar en que las personas... todos nos podemos equivocar, yo me he equivocado, todos nos podemos equivocar, pero en lo que tú no te puede equivocar es que **tú siempre tienes que decir la verdad** y tú tienes que ser recto en tu...en tus posiciones y en la manera en que tú te comunicas. Y cuando tú tienes una responsabilidad de un taller, de unos clientes, de un grupo de trabajo, si te equivocaste, te equivocaste, pero **no puedes tratar de estar tratando de tapar el cielo con la mano** y tratar de cubrir situaciones que se pudieron haber atendido **desde un principio y resolverse** y no crear una situación peor de la que estábamos manejando en ese momento. Y... [Énfasis nuestro]

Por otro lado, indicó que no tuvo comunicación con Recursos Humanos el 3 de noviembre de 2021 para el despido, sino que fue él mismo quien lo despidió.[30]

Culminado los procedimientos, y luego de evaluada la prueba, así como aquilatada la credibilidad de los testigos, el TPI declaró *Ha Lugar* a la *Querella* mediante la *Sentencia* dictada el 11 de diciembre de 2023.[31] En dicho dictamen, el foro primario realizó sesenta y seis (66) determinaciones de hechos de las cuales destacamos las siguientes: [32]

- El querellante comenzó a trabajar para la querellada el 14 de mayo de 2014.

- El querellante trabajó para la querellada hasta el **3 de noviembre de 2021**.

- Al momento de su despido, el querellante se desempeñaba como Gerente de Servicios en el Centro de Servicios Honda Kennedy.

- El querellante laboró para la querellada por un período de siete (7) años.

---

[28] Véase, TPO del 2 de noviembre de 2023, en las págs. 33-39.
[29] *Íd.*, a la pág. 40.
[30] *Íd.*, en la pág. 100.
[31] Véase, Apéndice I del Recurso, a las págs. 1-26.
[32] *Íd.,* a las págs. 11-18. Determinaciones de hechos 1-5, 7-11, 51-65.

- El 10 de agosto de 2020, el Querellante recibe el Documento titulado "Repaso de Procesos y Políticas para Asesores de Servicio".

- El documento titulado "Repaso de Procesos y Políticas para Asesores de Servicio" incluye las normas establecidas por la Compañía que todo empleado debe seguir e incluye una lista no taxativa de responsabilidades que tienen los asesores de servicio. Entre las responsabilidades se encuentra: "Ofrecer un servicio al cliente extraordinario, exceder expectativas, deleitar al cliente interno y externo, así como modelar los valores y principios de la empresa".

- A la fecha del despido del Querellante, el 3 de noviembre de 2021, **el vicepresidente de Piezas y Servicios José Medina Nieves era el supervisor directo del Querellante**.

- A la fecha del despido del Querellante, el 3 de noviembre de 2021, la directora de Recursos Humanos de la Compañía era Daisy Rodríguez.

- A la fecha del despido del Querellante, el 3 de noviembre de 2021, **el presidente y Principal Oficial Ejecutivo de la Compañía era Carlos López-Lay Vizcarra**.

- La directora de Recursos Humanos **no tuvo participación** en el despido del Querellante el 3 de noviembre de 2021.

- El vicepresidente de Piezas y Servicios, José Medina Nieves quien era el supervisor directo del **Querellante no tuvo participación en el despido** del Querellante el 3 de noviembre de 2021.

- El 3 de noviembre de 2023, comienza a trabajar en el Centro de Servicio Honda Kennedy, la asesora de servicio Yaritza López. El Querellante la recibió, se reunió con ella y le indicó que le dejara saber inmediatamente de cualquier duda o asunto que tuviera para ayudarle.

- El 3 de noviembre de 2023, alrededor de las **11:00 AM**, el Querellante le pregunta a la asesora de servicio Yaritza López si todo estaba bien y ésta le indicó que había recibido a algunos clientes.

- El 3 de noviembre de 2023, alrededor de las **2:00 PM** el Querellante le pregunta a la asesora de servicio Yaritza López, como le iba, y **ésta le indicó que todo iba bien**.

- El 3 de noviembre de 2023, alrededor de las **4:00 PM** se reúne con el jefe de taller Miguel Huertas para

discutir varios asuntos antes de que el Querellante comenzara sus vacaciones.

- El 3 de noviembre de 2023, **alrededor de las 4:30 PM** el Querellante recibe una llamada de la asesora de servicios Yaritza López **donde le indica que tiene una cliente molesta.** La asesora de servicios Yaritza López indica que pide un DSM y llevaba tiempo esperando la autorización. Por la hora que era al no haber un DSM y el técnico salir a las 5:00 PM, no dará tiempo a reparar por lo que comenzó a hacer gestiones con el gerente de rentas Víctor Fernández para conseguir un "rental" o vehículo de transporte sustituta. No le contestan al Querellante.

- El 3 de noviembre de 2021, el presidente Carlos López-Lay visita el Centro de Servicio Honda Kennedy.

- Mientras se encontraba en el Centro de Servicio Honda Kennedy el 3 de noviembre de 2021 alrededor de las 4:30 PM, el presidente Carlos López-Lay interactúa con una clienta (la "Clienta") **a quien identificó como molesta** por que había sido **citada a las 8:00 AM y no la habían atendido.**

- Luego de interactuar con la Clienta, el presidente Carlos López-Lay entra a la oficina del Querellante, quien se encontraba con el jefe de taller Miguel Huertas, y **lo confronta sobre la situación con la Clienta**. El Querellante le indica al presidente Carlos López-Lay, "sí, ahora mismo lo estamos resolviendo".

- El presidente Carlos López-Lay sale de la oficina para volver con la Clienta.

- En ese momento el Querellante recibe una llamada del gerente de rentas Víctor Fernández quien **le indica que tiene una unidad disponible**. El Querellante sale de su oficina y se dirige donde la asesora de servicios Yaritza López **para que le indicara quien era la Clienta**.

- Una vez identificada, el Querellante se dirige donde la Clienta que estaba con el presidente Carlos López-Lay y en ese momento el presidente Carlos López-Lay le indica al Querellante que lo deje solo con la Clienta que él la iba a atender.

- El presidente Carlos López-Lay llamó a vicepresidente de Piezas y Servicios, José Medina Nieves para que le consiguiera un carro a la Clienta.

- Según manifiesta el presidente Carlos López-Lay, éste vuelve a la oficina del Querellante, no permite que el Querellante explique lo que ocurrió y le dice al Querellante: "Pedro aquí no hay explicación que dar, así que recoge tu oficina".

El foro primario razonó que el despido fulminante del señor Cruz Amadeo por parte del CEO y presidente de la compañía, el Sr. Carlos López-Lay Vizcarra, fue uno irrazonable. Así las cosas, determinó que: [33]

> En ningún momento durante ese evento surge que el presidente Carlos López-Lay haya hecho consulta alguna a la directora de Recursos Humanos, Sra. Daisy Rodríguez o al supervisor directo del Querellante, el vicepresidente de Piezas y Servicios José Medina Nieves, o que haya tomado en consideración las evaluaciones de gerente o los eventos administrativos específicos que se trajeron al juicio en su fondo para su determinación de terminar el empleo del Querellante.
>
> [...]
>
> La acción del presidente Carlos López-Lay de no darle oportunidad al Querellante explicarle y despedirlo en el momento, fue una irrazonable; más aún cuando del testimonio del Querellante, al cual se le dio entera credibilidad, surge que **no se le dio conocimiento de la situación con la Clienta hasta alrededor de las 4:30 PM**; **aun siendo el Querellante proactivo** y haberle preguntado a la asesora de servicio a eso las 11:00 AM y 2:00 PM, si había alguna situación que requiriera de su atención. En cuanto el Querellante tuvo conocimiento, **éste tomo acciones para remediar la situación, e intentó comunicarle a la Cliente la acción correspondiente**. De habérsele dado la oportunidad al Querellante a explicar lo sucedido con las acciones tomadas, otra pudo haber sido la determinación de la Querellada, **en lugar de haber optado por la drástica opción de un despido fulminante** sin haber corroborado primero lo alegado por el Querellante. [Énfasis Nuestro]

Inconforme con la decisión tomada por el TPI, la parte apelante acude ante este foro intermedio mediante el recurso de *Apelación* de epígrafe imputándole al foro primario haber incurrido en los siguientes errores:

> PRIMER ERROR: ERRÓ EL HONORABLE TPI AL SUSTITUIR EL CRITERIO GERENCIAL DEL SR. L[Ó]PEZ-LAY COMO EJECUTIVO M[Á]S ALTO DE LA EMPRESA, POR EL CRITERIO DEL HONORABLE JUEZ DEL TPI.
>
> SEGUNDO ERROR: ERR[Ó] EL HONORABLE TRIBUNAL AL DETERMINAR QUE EL DESPIDO DEL SR. PEDRO CRUZ ESTUVO JUSITFICADO A PESAR DEL EXTENSO HISTORIAL DISCIPLINARIO Y DE QUE LA PRUEBA DEMOSTRÓ QUE SU PROCEDER EL 3 DE NOVIEMBRE DE 2021 FUE CONTRARIO A LO QUE SE REQUER[Í]A DE EL COMO GERENTE DE SERVICIO.

---

[33] *Íd.*, a las págs. 22-23.

El 22 de febrero de 2024, dictamos una *Resolución* dando por estipulada la Transcripción de la Prueba Oral y concedimos término para la presentación de los alegatos suplementario y en oposición. Luego de concedida una prórroga, el 20 de marzo siguiente, la apelante presentó su alegato suplementario. El 22 de abril de 2024, el apelado presentó su *Alegato en oposición a Recurso de Apelación*, por lo que nos damos por cumplidos y perfeccionado el recurso.

Analizados los escritos, el expediente apelativo y la transcripción de la prueba oral del juicio; así como estudiado el derecho aplicable, procedemos a resolver.

**II.**

**La indemnización por despido sin justa causa**

La Ley núm. 80 de 30 de mayo de 1976, según enmendada, conocida como la *Ley de Indemnización por despido sin justa causa*, 29 LPRA sec. 185a *et seq.* (Ley núm. 80), confiere a todo empleado contratado, sin tiempo determinado, el derecho a ser indemnizado por su patrono en caso de ser despedido sin justa causa por este. *Vélez Rodríguez v. Pueblo Int'l, Inc.*, 135 DPR 500 (1994).[34] El fin de esta legislación es proteger económicamente al empleado del sector privado y desalentar el despido injustificado. *Romero et als. v. Cabrer Roig et als.,* 191 DPR 643, 649 (2014).

El Artículo 1 de la Ley núm. 80, 29 LPRA sec. 185a, expone que todo empleado despedido sin justa causa tendrá derecho a recibir una indemnización, además del sueldo que dejó de devengar. A esa compensación, se le conoce como la mesada cuya cuantía dependerá: (1) del tiempo que el empleado ocupó su puesto, y (2) del sueldo que devengaba. *Romero et als. v. Cabrer Roig et als.,* supra; *Rivera Figueroa v. The Fuller Brush, Co.,* 180 DPR 894, 905 (2011);

---

[34] A modo ilustrativo, resaltamos que la Ley núm. 4-2017, mejor conocida como *Ley de Transformación y Flexibilidad Laboral*, enmendó en varios aspectos la Ley núm. 80.

*Vélez Cortés v. Baxter*, 179 DPR 455, 465-467 (2010). La mesada es el remedio exclusivo disponible para un empleado que ha sido despedido sin justa causa, o de modo injustificado. *Ortiz Ortiz v. Medtronic*, 209 DPR 759, 771 (2022).

El Artículo 2 de la Ley núm. 80, 29 LPRA sec. 185b, detalla las circunstancias, no taxativas, constitutivas de justa causa para el despido, las cuales son: (a) que el empleado observe un patrón de conducta impropia o desordenada; (b) que el empleado no rinda su trabajo eficientemente o lo haga tardía y negligentemente o en violación de las normas de calidad del producto que se produce o se maneja por el establecimiento; (c) que el empleado viole reiteradamente las reglas y los reglamentos razonables establecidos para el funcionamiento del establecimiento, siempre que se le haya suministrado oportunamente copia escrita de estos; (d) que surja el cierre total, temporero o parcial de las operaciones del establecimiento; (e) que sucedan cambios tecnológicos o de reorganización, cambios de estilo, diseño o naturaleza del producto que se produce o se maneja por el establecimiento y cambios en los servicios provistos al público; o, (f) que se requieran reducciones en empleo debido a una reducción en el volumen de producción, ventas o ganancias, anticipadas o que prevalecen al ocurrir el despido. *Rivera Figueroa v. The Fuller Brush, Co.*, supra, a las págs. 905-906.

Por otro lado, no se considera justa causa para el despido de un empleado, "[...]aquel que se hace por mero capricho del patrono o sin razón relacionada con el buen y normal funcionamiento del establecimiento". *León Torres v. Rivera Lebrón*, 204 DPR 20, 38 (2020). Por ende, la tarea de los tribunales en casos de despido injustificado es evaluar las situaciones específicas que se les presentan para determinar si existió la justa causa para el despido, aunque la situación no esté específicamente enumerada en el estatuto. *Jusino et als. v. Walgreens*, 155 DPR 560, 572 (2001). No

obstante, los patronos pueden establecer reglamentos internos para fijar las normas de conducta que regirán en sus lugares de trabajo y los empleados estarán sujetos a estas normas siempre y cuando estas sean razonables. *Rivera v. Pan Pepín,* 161 DPR 681, 689 (2004); *Jusino et als. v. Walgreens,* pág. 573. El Tribunal Supremo ha establecido que las violaciones a estas normas internas de conducta constituirán justa causa para el despido de empleados cuando el patrono logre demostrar que las reglas son razonables, que se les suministró copia escrita de dichas normas a los empleados y que el empleado violó las normas en reiteradas ocasiones. *Íd.,* a las págs. 572-573.

Nuestro ordenamiento jurídico ha establecido que la Ley núm. 80, *supra,* "[...]no dispone un mínimo de amonestaciones antes de que el patrono pueda despedir al empleado justificadamente, ni tampoco que la amonestación debe hacerse en determinada forma". *Ortiz Ortiz v. Medtronic,* supra, en la pág.772, citando a A. Acevedo Colom, *Legislación protectora del trabajo comentada,* 8va ed. rev., San Juan, Ed. Ramallo Printing Bros., 2005, pág. 137-138. De igual forma, ha expresado que la Ley núm. 80, *supra,* no favorece el despido de un empleado cuando ocurre una primera falta. *Feliciano Martez v. Sheraton,* 182 DPR 368, 382 (2011); *Srio. del Trabajo v. I.T.T.,* 108 DPR 536, 542 (1979). Por otro lado, una falta o un acto aislado, por lo general, no son justa causa para el despido de un empleado. *Feliciano Martez v. Sheraton,* supra. Para que una falta o un acto aislado sean considerados justa causa para el despido de un empleado tiene que ser de tal seriedad o naturaleza que:

> [...] revele una actitud o un detalle de su carácter, tan lesivo a la paz y al buen orden de la empresa, que constituiría imprudencia esperar su reiteración para separarlo del establecimiento. *Srio. del Trabajo v. I.T.T.,* supra, en la pág. 544.

En lo aquí pertinente, la Sección 9.2 de las *Guías para la Interpretación de la Legislación Laboral de Puerto Rico*, 1era. Edición del 8 de mayo de 2019, emitidas por el Departamento del Trabajo y Recursos Humanos del Gobierno de Puerto Rico, disponen y citamos:

> Los patronos tienen a su haber la potestad de definir razonablemente aquellas normas para la sana administración de la empresa. Las normas impuestas por el patrono complementan aquellos deberes básicos de los empleados codificados en el Artículo 2.15 de la Ley 4-2017 [29 LPRA sec. 194-194b], discutido en el Capítulo 3 de estas Guías. Así, por ejemplo, un patrono podrá disponer aquellas faltas que no requieren disciplina progresiva en su taller de trabajo y que solo admiten la cesantía del empleado. Aunque la disciplina progresiva **es altamente recomendable** debido a que promueve la profesionalización de los empleados en una empresa, **no existe un requerimiento legal a esos efectos**. Por lo tanto, un patrono **puede tomar la decisión de proteger la buena marcha de su negocio a través del despido del empleado**. De nuevo, lo determinante en esos casos no será la acción adversa *per se*, sino **la proporcionalidad de la sanción en torno al acto u omisión del empleado**. El análisis requerirá, necesariamente, una abstracción de los efectos de la acción de personal sobre el empleado. Además, según quedó codificado en el Artículo 2.12 de la Ley 4-2017, se exige que se le dé deferencia a la interpretación del propio patrono a sus normas y reglamentos internos, siempre y cuando estos sean razonables. [29 LPRA sec. 122k]. Así, un juzgador de hechos no puede entrar a reescribir una norma patronal, **si esta y la interpretación del patrono son razonables**. Sin embargo, se debe tener en consideración que el patrono tiene derecho a evaluar a sus empleados de conformidad con los valores morales y de orden público prevalecientes, aun cuando estos no se hayan integrado expresamente en el reglamento o manual de personal de la empresa. Lo determinante será **la intensidad del agravio y su efecto potencial sobre el buen y normal funcionamiento de la empresa**. [González Santiago, 2019 TSPR 79, pág. 15 (citas omitidas)]. *Íd.*, a la pág. 128.

**La apreciación de la prueba y el estándar de revisión apelativa**

Es norma trillada que, en ausencia de error, prejuicio o parcialidad, los tribunales apelativos no intervendrán con las determinaciones de hechos, con la apreciación de la prueba, ni con la adjudicación de credibilidad efectuadas por el Tribunal de Primera Instancia. *González Hernández v. González Hernández,* 181 DPR 746, 776 (2011); *Ramírez Ferrer v. Conagra Foods PR,* 175 DPR 799, 811 (2009). Esta norma de deferencia judicial

descansa en que el juez ante quien declaran los testigos es quien tiene la oportunidad de verlos y observar su manera de declarar, apreciar sus gestos, titubeos, contradicciones y todo su comportamiento mientras declaran; factores que van formando gradualmente en su conciencia la convicción sobre la verdad de lo declarado. *Suárez Cáceres v. Com. Estatal Elecciones,* 176 DPR 31, 68 (2009). Es ante la presencia de alguno de estos elementos o cuando la apreciación de la prueba no concuerde con la realidad fáctica, sea inherentemente increíble o claramente imposible, que se intervendrá con la apreciación efectuada. *Pueblo v. Irizarry,* 156 DPR 780, 789 (2002).

Además, en reiteradas ocasiones el Tribunal Supremo ha establecido "[...] que la declaración directa de un solo testigo, de ser creída por el juzgador de los hechos, es prueba suficiente de cualquier hecho. [...]" *Trinidad v. Chade,* 153 DPR 280, 291 (2001). Corresponde al tribunal sentenciador aquilatar la prueba testifical ofrecida y dirimir su credibilidad. En razón de ello repetidamente se ha establecido que, en asuntos de credibilidad de la prueba, se concederá gran deferencia a las determinaciones de hechos efectuadas por los tribunales de primera instancia. *Pueblo v. Torres Rivera,* 137 DPR 630 (1994). "Se impone un respeto a la aquilatación de credibilidad del foro primario en consideración a que, de ordinario, 's[o]lo tenemos récords mudos e inexpresivos'." *Pérez Cruz v. Hosp. La Concepción,* 115 DPR 721, 728 (1984). *Trinidad v. Chade,* supra, a la pág. 291.

De otra parte, cuando se evalúa la prueba documental, el foro apelativo se encuentra en la misma posición que el foro de primera instancia. Al tener ante sí los mismos documentos que desfilaron ante el juzgador de instancia, no hay emociones o comportamientos que el juzgador apelativo esté dejando fuera de la ecuación. "Somos conscientes, naturalmente, que en relación con la evaluación de

prueba documental este tribunal está en idéntica situación que los tribunales de instancia." *Trinidad v. Chade*, supra, a la pág. 292.

### III.

La apelante señaló que erró el foro primario al sustituir el criterio gerencial del señor López-Lay por el suyo y al determinar que el despido del señor Cruz Amadeo no estuvo justificado a pesar de su extenso historial disciplinario. Por estar los errores relacionados entre sí, los discutiremos conjuntamente.

De entrada, recordamos que, en nuestro ordenamiento jurídico, cuando se cuestiona la apreciación de la prueba hecha por el foro primario, debemos dar deferencia y solo intervenir cuando se demuestra satisfactoriamente la existencia de pasión, prejuicio, parcialidad o error manifiesto.[35]

En apretada síntesis, arguye la apelante que el foro apelado ignoró la prueba "robusta de extensos incumplimientos y pobre desempeño" del apelado. Al respecto, apuntala que el apelado contaba con un "extenso historial de mal desempeño y de faltas a las normas y políticas de la empresa", por lo que su despido estuvo justificado. Argumentó, además, que el incumplimiento de manera "drástica" según surge de sus evaluaciones, fue una de las muchas razones que tuvo el señor López-Lay para despedir al apelado.

De una evaluación de la TPO y de la prueba documental surge que las puntuaciones recibidas en las evaluaciones mensuales están relacionadas a unas metas, tanto de servicio, como de ventas, que deben cumplir en cada centro. Dichas evaluaciones no responden principalmente, o solamente, al incumplimiento del apelado con las normas establecidas en el *Manual del Empleado* de la empresa. Así, del examen de estas se demuestra que en su mayoría están relacionadas con <u>las ventas de gomas y la productividad del</u>

---

[35] Véase, *Pueblo v. Maisonave*, 129 DPR 49, 62-63 (1991); *Pueblo v. Irizarry*, 156 DPR 780, 789 (2002).

establecimiento.[36] Por lo cual, las evaluaciones mensuales **no representan el alegado craso incumplimiento** con las normas de la empresa. Hay que destacar que en el *Manual del Empleado* se indica que:[37]

> [...]. Las normas de conducta son una guía del comportamiento que se espera de todos. Las mismas tienen aplicabilidad a todos los empleados de la empresa, independiente su clasificación ... Incumplir con las mismas, puede conllevar la imposición de medidas disciplinarias que pueden contemplar, sin limitarse a, amonestaciones verbales, amonestaciones escritas, suspensión sin sueldo, terminación de empleo o una combinación de estas, entre tanto no sean incompatibles. Las medidas disciplinarias a imponerse en cada caso dependerán de las **circunstancias de cada situación, su gravedad, grado de negligencia o culpa**, naturaleza de esta, valores de la empresa afectados, relación con otras leyes o normas, efecto o consecuencias, el historial previo del empleado entre otras.
>
> Estas reglas descritas no contemplan todas las situaciones que podrían afectar negativamente el buen funcionamiento de la empresa. Si algún empleado comete o incurre en alguna conduta por acción u omisión, que no esté contemplada dentro de las normas en este Manual, ... se aplicará **las medidas correctivas y disciplinarias correspondientes de acuerdo con la severidad del caso**, utilizando como guía aquellas normas establecidas que sean **más afines a la situación confrontada**. [...]" (Énfasis nuestro)

Conforme al propio manual de la apelante, surge que en el caso de autos no se presentaron los criterios necesarios para determinar que las faltas incurridas por el señor Cruz Amadeo requerían como medida correctiva su despido o en su defecto que el acto ocurrido el 3 de noviembre de 2021 fuese de tal gravedad que requería su despido fulminante. Nos explicamos.

En cuanto a las amonestaciones verbales y escritas durante los años 2019 al 2021 se observa que ninguna está relacionada con problemas en el área de servicio al cliente. De los propios argumentos de la parte apelante, y de la prueba documental, surge que estos fueron por: preferencia con algunos empleados, exceso de preasignaciones de trabajos a ciertos empleados, permitir que

---

[36] Véase, Apéndice del Recurso a las págs. 396, 397, 405, 406, 407, 408 409 y 411.

[37] *Íd.*, a la pág. 341.

empleados utilizaran su contraseña de gerente para asignarse trabajos, algunos de sus empleados no realizaban sus ponches, resultados de productividad no favorables, manejos operacionales y no reunirse mensualmente con sus empleados, siendo ésta la última hecha en julio 2021.[38] Sin duda, ninguno está relacionado con su despido. Asimismo, en todas las evaluaciones, la medida correctiva más "grave" fue una amonestación escrita.[39] En el 2021, recibió una advertencia verbal por deficiencia en el desempeño de sus labores.[40]

No pese a lo anterior, enfatizamos que en el contexto de su despido "fulminante" **estas amonestaciones no fueron consideradas**, **igualmente no surge de la prueba que estas tengan una correlación con lo ocurrido el 3 de noviembre de 2021**.[41]

De otra parte, no hay prueba alguna de que estos eventos provocaron graves daños a las operaciones de la empresa o pusieron en peligro "la estabilidad del negocio". Al respecto, es menester destacar el axioma de derecho alto conocido que las alegaciones no hacen prueba. Incluso, la propia política de BI es aplicar las medidas correctivas y disciplinarias correspondientes de acuerdo con la severidad del acto. Por ende, ante la ausencia del alegado historial de incumplimientos con las normas de la empresa era preciso que el TPI evaluara los hechos ocurridos el 3 de noviembre de 2021 para así poder determinar si su severidad fue de tal grado que ameritaba el despido del apelado y si para ello se utilizaron como guía las normas más afines a la situación confrontada.

En cuanto al hecho que motivó el despido del apelado, alegó la apelante que este, como gerente de servicio, debió haber "dado la cara y hablar con la clienta disgustada enseguida se enteró. Por

---

[38] *Íd.,* a las págs. 384-414, 606-628.
[39] *Íd.,* a las págs. 398, 399, 400 y 410.
[40] *Íd.,* a la pág. 412.
[41] Véase, TPO del 2 de noviembre de 2023, en las págs. 94-95, 98-99, 143-144.

tanto, no haberlo hecho constituyó otra falta del querellante en el desempeño de sus funciones." Sin embargo, la apelante obvia ciertos hechos a los cuales el TPI le dio entera credibilidad, a saber, que el 3 de noviembre de 2023, el apelado recibió a la asesora de servicio Yaritza López y le indicó que le dejara saber inmediatamente de cualquier duda o asunto que tuviera para ayudarle. Luego, durante el día, le preguntó en dos (2) ocasiones, a las 11:00 am y a las 2:00 pm si todo estaba bien, a lo que ésta contestó que sí. Por tanto, la asesora de servicio no le comunicó al señor Cruz Amadeo de la supuesta situación que aquejaba a una cliente. De hecho, ninguno de los testigos declaró que el apelado conocía desde las 8:00 am que ésta había llegado a su cita. No es hasta las 4:30 pm que la asesora de servicio se comunica con el apelado para indicarle que tiene a una cliente molesta y que llevaba rato esperando el DSM.

De igual manera, es a partir de las 4:30 pm que el señor López-Lay se topa con la cliente y ésta le comunica lo sucedido.[42] Destacamos que la asesora de servicio, Yaritza López**, no fue testigo en el presente caso**, a pesar de que ella fue quien atendió en primera instancia a la supuesta cliente enojada.[43] Acentuamos, de igual manera, que no surge de la prueba, tanto oral como escrita, el nombre de la cliente, su problema con el vehículo ni la situación que provocó que se mantuviera desde las 8:00 am hasta las 4:30 pm esperando. A su vez, no hay evidencia alguna que corrobore que el apelado tenía conocimiento de la demora o el atraso en la solicitud del DSM ni menos que él citó a la cliente o que ésta hubiese sido citada, o que hubiera comparecido al centro en tres ocasiones previas por el mismo problema del automóvil.

Por otro lado, y más importante aún, es el hecho de que no existe prueba que permita concluir que lo ocurrido el 3 de noviembre

---

[42] Véase, TPO del 9 de noviembre de 2023, en las págs. 92-98.
[43] Véase, TPO del 2 de noviembre de 2023, en las págs. 94-95, 98-99, 143-144.

de 2021 fuese de tal gravedad que ameritara el despido inmediato del señor Cruz Amadeo. Nótese que, conforme a su testimonio, una vez conoció del asunto se comunicó con el gerente de rentas Víctor Fernández para conseguirle a la cliente un "rental" o vehículo de transporte sustituto. El Sr. Víctor Fernández no fue testigo en el presente pleito. Por su parte, el señor López-Lay declaró que llamó al vicepresidente de Piezas y Servicios, José Medina Nieves, para que le consiguiera un carro a la cliente. Sin embargo, José Medina Nieves, quien era el supervisor directo del Querellante, **no tuvo participación en el despido.** En resumen, surge del testimonio del apelado y del señor López-Lay que este no tuvo conocimiento de lo ocurrido durante el día, sino que conoció en horas de tarde y realizaron acciones encaminadas a resolver el problema.[44]

En conclusión, actuó correctamente el TPI al concluir que el despido del apelante no fue razonable ni proporcional al acto ocurrido el 3 de noviembre de 2021. Revisado el expediente judicial y las transcripciones orales del Juicio en su fondo, celebrado los días 1, 2, 3, 6, 8 y 9 de noviembre de 2023, no vemos en alguna instancia que el TPI haya sustituido el criterio gerencial del señor López-Lay. El foro primario se limitó a aquilatar la prueba conforme a derecho para así resolver la controversia concluyendo que el despido "fulminante" del señor Cruz Amadeo no estuvo justificado. Por no existir pasión, prejuicio, parcialidad o error manifiesto, damos entera deferencia al foro primario y forzoso es concluir que los errores señalados no se cometieron.

**IV.**

Por los fundamentos antes expuestos, se confirma la *Sentencia* apelada.

Notifíquese.

---

[44] *Íd.*, en las págs. 31-34; TPO del 9 de noviembre de 2023, en las págs. 92-98.

Lo acordó y manda el Tribunal y lo certifica la Secretaria del Tribunal de Apelaciones.


LCDA. LILIA M. OQUENDO SOLÍS
Secretaria del Tribunal de Apelaciones