ESTADO LIBRE ASOCIADO DE PUERTO RICO
TRIBUNAL DE APELACIONES
PANEL ESPECIAL (IV)

| | | |
|---|---|---|
| AMARILYS NEGRÓN MARTÍNEZ y OTROS<br><br>Parte Apelante<br><br>v.<br><br>DR. JOSÉ A. RAMIREZ RAMOS y OTROS<br><br>Parte Apelada | KLAN202500392 | APELACIÓN procedente del Tribunal de Primera Instancia, Sala de Mayagüez<br><br>Civil Número: MZ2019CV00245<br><br>Sobre: Daños y Perjuicios |

Panel integrado por su presidenta, la Jueza Ortiz Flores, la Jueza Aldebol Mora y la Jueza Boria Vizcarrondo

Ortiz Flores, Juez Ponente

### SENTENCIA

En San Juan, Puerto Rico, a 23 de abril de 2026.

Comparece ante nos la señora Amarilys Negrón Martínez, el señor Orlando Negrón Martínez, la señora Edna E. Ramos Miranda, el señor Juan Ovidio Negrón Martínez y la señora Aracelis Quiñones Martínez (parte apelante) mediante *Apelación Civil* y nos solicitan la revisión de una *Sentencia Enmendada* emitida el 18 de marzo de 2025 y notificada el 22 de abril de 2025 por el Tribunal de Primera Instancia, Sala de Mayagüez. Mediante el referido dictamen, el foro primario desestimó la causa de acción contra el Dr. José A. Ramírez Ramos y el Sindicato de Aseguradores para la Suscripción Conjunta de Seguros de Responsabilidad Médico Hospitalaria (SIMED) (parte apelada).

Por los fundamentos que expondremos, se confirma el dictamen apelado.

### I

El 26 de febrero de 2019, la señora Amarilys Negrón Martínez; el señor Orlando Negrón Martínez, su esposa Edna E. Ramos Miranda y la Sociedad Legal de Gananciales compuesta por ambos; el señor Alberto Negrón Martínez, su esposa Yailyn González Semidey y la Sociedad Legal de Gananciales compuesta por ambos; el señor Juan Ovidio Negrón

Número Identificador

Sent _____

Martínez y, la señora Aracelis Quiñones Martínez presentaron *Demanda*[1] contra el Dr. José A. Ramírez Ramos por daños y perjuicios por impericia médica. Manifestó que los señores Orlando, Alberto, Juan Ovidio y la señora Amarilys, todos de apellidos Negrón Martínez, eran descendientes del señor Ovidio Negrón Rivera (el causante), mientras que la señora Aracelis Quiñones era hija de crianza del causante. Añadió que el Dr. Ramírez Ramos fue el médico de cabecera del señor Negrón Rivera, hasta su fallecimiento en la fecha del 9 de marzo de 2018.

En síntesis, adujo que el 7 de febrero de 2018, el causante visitó la oficina del Dr. Ramírez Ramos con un agudo dolor de espalda, por consiguiente, se le realizó una Imagen de Resonancia Magnética (MRI) en el Hospital de la Concepción. Agregó que posterior a ello, el 23 de febrero de 2018, el causante visitó al fisiatra debido a dolor de espalda agudo y, por primera vez se le informó que sufría cáncer. Esbozó que, el 24 de febrero de 2018, el causante fue admitido en la sala de emergencias del Hospital la Concepción con diagnóstico de bronco-pulmonía, fallo respiratorio, cáncer de pulmón metastático a huesos e hígado, anemia e insuficiencia renal. Sostuvo que, el 9 de marzo de 2018, el causante falleció a causa del diagnóstico y tratamiento descuidado y negligente otorgado por el Dr. Ramírez Ramos. A tales efectos, solicitó al foro primario que ordenase al apelado a realizar el pago de una indemnización en concepto de daños por la cantidad de quinientos mil dólares ($500,000) a cada uno de los demandantes-apelantes; la cantidad de cien mil dólares ($100,000) a cada cónyuge de los descendientes, y una cantidad no menor de cincuenta mil dólares ($50,000) por costas, gastos y honorarios de abogado.

Posteriormente, el 12 de junio de 2019, la parte apelante instó *Primera Demanda Enmendada*[2] con el propósito de incluir a SIMED, aseguradora del Dr. Ramírez Ramos, como parte demandada en el pleito.

---

[1] Apéndice del recurso a las págs. 1-5.
[2] Apéndice del recurso a las págs. 6-10.

El 7 de agosto de 2019, compareció la parte apelada mediante *Contestación a la Demanda*.[3] En fecha posterior, el 7 de noviembre de 2019, la parte apelada instó *Contestación a la Primera Demanda Enmendada*.[4] En su alegación responsiva, negó las imputaciones sobre negligencia médica y consignó ciertas defensas afirmativas. Sostuvo que, a la luz de los modernos medios de comunicación y de enseñanza, brindó al causante la ayuda y atención médica en observancia a las exigencias profesionales reconocidas por la profesión. A tenor, solicitó al foro primario que declarase *No Ha Lugar* la demanda de título.

Tras varias incidencias procesales, los días 27, 28 y 29 de junio de 2023, se celebró Juicio en su Fondo. En el desfile de prueba, la parte apelante presentó el testimonio del perito médico Dr. Raúl H. Morales Borges, quien fue calificado como perito especialista Hematólogo Oncólogo. Asimismo, desfilaron como testigos los demandantes-apelantes. Por su parte, el apelado presentó como testigo perito al Dr. José Andrés Rivera Guzmán, quien fue calificado como especialista en medicina Interna y General. También fungió como testigo el propio apelado, Dr. Ramírez Ramos.

Consecuentemente, el 19 de diciembre de 2024 con notificación el 2 de enero de 2025, el Tribunal de Primera Instancia emitió *Sentencia*.[5] En la misma, el foro primario desestimó el pleito en cuanto al Dr. Ramírez Ramos y la compañía SIMED. Dado lo anterior, el 16 de enero de 2025, la parte apelante instó *Moción de Reconsideración de la Sentencia emitida y para que se Emitan Determinaciones de Hechos Adicionales (Regla 43.1 y Regla 47 de las Reglas de Procedimiento Civil)*.[6]

Posterior a ello, el 19 de marzo de 2025, el Tribunal de Primera Instancia notificó *Sentencia Enmendada*.[7] Mediante el referido dictamen, el foro primario estableció como prueba estipulada lo siguiente:

---

[3] Apéndice del recurso a las págs. 11-16.
[4] Apéndice del recurso a las págs. 17-22.
[5] Apéndice del recurso a las págs. 23-43.
[6] Apéndice del recurso a las págs. 44-49.
[7] Apéndice del recurso a las págs. 50-74.

Autenticidad de los récords médicos del Sr. Ovidio Negrón Rivera (DEP) de las siguientes oficinas médicas y Hospitales según fueron marcados:

I. Récord médico oficina Dra. Ivette L. Cruz Rivera (fisiatra).

II. Récord médico Sala de Emergencia de Hospital de la Concepción.

III. Hospitalización Hospital de la Concepción (HDLC) 2/24/2018 al 03/9/2018.

IV. Récord médico de oficina Dr. Francisco J. Guzmán (cardiólogo).

V. Récord médico oficina Dr. José Ramírez Ramos.

VI. CV Dr. Raúl H. Morales Borges.

VII. CV. Dr. José Andrés Rivera Guzmán.

Asimismo, mediante su dictamen, el foro primario realizó ciertas determinaciones de hechos, a saber:

Hechos estipulados por las partes:

1. El señor Ovidio Negrón Rivera fue paciente del Dr. Ramírez Ramos de mayo de 2001 hasta febrero de 2018.

2. El Dr. Ramírez evaluaba al Sr. Negrón con una frecuencia de tres a cuatro veces al año.

3. El MRI lumbar del 7 de febrero de 2018, confirmó enfermedad osteoartrítica multinivel, enfermedad discogénica y enfermedad de facetas. Además, se identificó una estrechez de la foramina izquierda a nivel LS-S1 por una lesión tumoral con metástasis ósea.

4. Por lo tanto, el Dr. Ramírez recomendó evaluación del fisiatra (PMR) para manejo del dolor agudo.

5. En la visita a la fisiatra la Dra. Ivette L. Cruz Rivera el 23 de febrero de 2018 esta le informa de la lesión tumoral lumbar y le recomienda al paciente comunicarse con su doctor primario.

6. El 27 de febrero de 2018 se hizo una biopsia por aspiración con una aguja fina (FNA) que reveló un Ademo Carcinoma de Pulmón de Células Grandes (NSCLC).

7. El Dr. Negrón, hematólogo-oncólogo primero recomendó una terapia con decadrón y luego el 2 de marzo de 2018 solo recomendó medidas paliativas por ser un cáncer de pulmón avanzado con metástasis a huesos e hígado.

8. El paciente falleció el 9 de marzo de 2018.

Hechos probados por la prueba:

1. Los demandantes Amarilys, Orlando, Alberto y Juan Ovidio, todos de apellidos Negrón Martínez, son los únicos hijos procreados por quien fuera don Ovidio

Negrón Rivera (el paciente), por lo que éstos forman su sucesión.

2. La demandante Aracelis Quiñones Martínez es hija de crianza de don Ovidio Negrón Rivera.

3. El Dr. Ramírez desde 2001, evaluaba al Sr. Negrón con una frecuencia de tres a cuatro veces al año. En esas visitas médicas se recetaban medicamentos de mantenimiento para tratar la hipertensión arterial y el hipercolesterolemia; se evaluaban laboratorios de mantenimiento y estudios recomendados por médicos subespecialistas.

4. Del expediente médico del finado Ovidio Negrón Rivera con el demandado Dr. José A. Ramírez Ramos, surge que el paciente le indica, el 19 de abril de 2006: "…pero me molesta el pecho a veces".

5. Del expediente médico del finado Ovidio Negrón Rivera con el demandado Dr. José A. Ramírez Ramos, surge que el paciente se queja, el 8 de junio de 2006: "…me sube la presión y mucho dolor de pecho".

6. Del expediente médico del finado Ovidio Negrón Rivera con el demandado Dr. José A. Ramírez Ramos, surge que el paciente le indica, el 26 de junio de 2006: "Me dio dolor de pecho la semana pasada".

7. Del expediente médico del finado Ovidio Negrón Rivera con el demandado Dr. José A. Ramírez Ramos, surge que el paciente le indica, el 28 de septiembre de 2006 (pág. 91): "Me dio dolor de pecho".

8. Del expediente médico del finado Ovidio Negrón Rivera con el demandado Dr. José A. Ramírez Ramos, surge que el paciente se queja, el 8 de noviembre de 2006: "…dificultad al respirar a veces".

9. Del expediente médico del finado Ovidio Negrón Rivera con el demandado Dr. José A. Ramírez Ramos, surge que el paciente se queja, el 5 de diciembre de 2006 (pág. 93): "Estoy bien, pero me fatigo a veces".

10. Del expediente médico del finado Ovidio Negrón Rivera con el demandado Dr. José A. Ramírez Ramos, surge que el paciente manifiesta, el 8 de junio de 2006, la queja de "…me sube la presión y mucho dolor de pecho".

11. Del expediente médico del finado Ovidio Negrón Rivera con el demandado Dr. José A. Ramírez Ramos, surge que el paciente se queja, en …2007: "Me siento regular me dan dolores de pecho a veces".

12. Del expediente médico del finado Ovidio Negrón Rivera con el demandado Dr. José A. Ramírez Ramos, surge que el paciente se queja, el 21 de mayo de 2007: "Me da un poco de fatiga y dolor de pecho al caminar".

13. Del expediente médico del finado Ovidio Negrón Rivera con el demandado Dr. José A. Ramírez Ramos, surge que el paciente se queja, el 20 de septiembre de 2007: "Tengo fatiga a veces, cuando camino".

14. Del expediente médico del finado Ovidio Negrón Rivera con el demandado Dr. José A. Ramírez

Ramos, surge que el paciente se queja, el 12 de julio de 2008, de "un poco de dolor de pecho a veces al ejercicio".

15. Del expediente médico del finado Ovidio Negrón Rivera con el demandado, Dr. José A. Ramírez Ramos, surge que el paciente se queja, el 23 de abril de 2009: "me da dolor de pecho a veces. Tuve catarro".

16. Del expediente médico del finado Ovidio Negrón Rivera con el demandado Dr. José A. Ramírez Ramos, surge que el paciente se queja, el 2/XII/2020 (pág. 82) se queja de: "me da dolor de pecho, pero estoy bien…".

17. Del expediente médico del finado Ovidio Negrón Rivera con el demandado, Dr. José A. Ramírez Ramos, surge que el paciente se queja, el 29 de julio de 2009: "me siento regular, hace como dos meses que no me da dolor de pecho".

18. Del expediente médico del finado Ovidio Negrón Rivera con el demandado, Dr. José A. Ramírez Ramos, surge que el paciente se queja, el 21 de febrero de 2014: "tengo dolor de mano y molestia al respirar".

19. El Dr. Ramírez como médico primario y el Dr. Francisco Guzmán como cardiólogo llevaron un cuidado coordinado entre 14 abril del 2014 a septiembre de 2014, cuando finalmente el paciente accedió a un cateterismo cardiaco (16 de septiembre de 2014) que confirmó enfermedad coronaria no obstructiva. La misma se manejó con terapia médica.

20. En el récord del cardiólogo que atendía al finado Ovidio Negrón Rivera, Dr. Francisco Guzmán, éste se queja de fácil fatiga al ejercicio, desde hace meses…son peores al ejercicio y que mejoran con descanso. Esta queja se repite los días 8/28/2014, 9/2/2014 y 3/9/2016.

21. El paciente no tuvo ninguna queja significativa por los siguientes dos años. En la visita del 16 de agosto de 2016, el paciente refirió un ánimo triste/depresivo porque acababa de enviudar, pero no requirió manejo psicológico o psiquiátrico adicional.

22. La radiografía tomada al finado Ovidio Negrón Rivera del año 2016, no fue ordenada por el demandado Dr. Ramírez Ramos.

23. El señor Ovidio Negrón Rivera nunca fumó.

24. Todos los demandantes testificaron que el Sr. Ovidio Negrón disfrutaba de salud y no aquejaba nada particular, hasta enero de 2018. De hecho, fue descrito como un hombre fuerte que hacía trabajos en el hogar y en el patio, sin problema alguno.

25. El paciente se quejó por primera vez de una molestia en la espalda baja luego de sufrir un trauma menor en el pie izquierdo durante una visita el 19 de enero de 2018.

26. Los signos vitales y el examen físico estaban dentro de los parámetros normales. El Dr. Ramírez le recomendó Rayos X del pie izquierdo y del área lumbo sacral. El estudio lumbo sacral fue tomado ese mismo día, pero la lectura con la firma el radiólogo estuvo

disponible para el 25 de enero de 2018. Esta confirmaba espasmos muscular lumbo sacral, enfermedad de discos a nivel L2- L3 y recomendaba un MRI lumbar.

27. El Dr. Ramírez le ordenó el MRI lumbar, el cual se realizó el 7 de febrero de 2018, pero la lectura con la firma del radiólogo estuvo disponible el 15 de febrero de 2018.

28. Al próximo día, 16 de febrero de 2018, el paciente regresó a la oficina del Dr. Ramírez con la lectura del MRI y refirió dolor de espalda y tener poco apetito.

29. El MRI lumbar confirmó enfermedad osteoartrítica multinivel, enfermedad discogénica y enfermedad de facetas. Además, se identificó una estrechez de la foramina izquierda a nivel LS-S1 por sospecha de una lesión tumoral con metástasis ósea.

30. El Dr. Ramírez recomendó evaluación del fisiatra (PMR) para manejo del dolor agudo. El paciente al momento no presentaba ningún compromiso cardiopulmonar.

31. El paciente visitó a la fisiatra la Dra. Ivette L. Cruz Rivera el 23 de febrero de 2018. Esta le informa de la lesión lumbar y le recomienda al paciente comunicarse con su doctor primario.

32. Inmediatamente fueron a la oficina del Dr. Ramírez, quien les sugiere ir a la Sala de Emergencias del Hospital La Concepción para una revisión médica y poder poner las consultas necesarias, para el manejo de la condición en forma intrahospitalaria.

33. El paciente llegó a la Sala de Emergencia del Hospital de la Concepción el mismo 23 de febrero de 2018, consultado y admitido el 24 de febrero de 2018 por una pulmonía obstructiva, anemia sintomática e insuficiencia renal aguda para recibir antibióticos, terapias respiratorias, transfusión de sangre y medicamentos.

34. El 27 de febrero de 2018 se hizo una biopsia por aspiración con una aguja fina (FNA) que reveló un Ademo Carcinoma de Pulmón de Células Grandes (NSCLC). El Dr. Negrón, hematólogo-oncólogo primero recomendó una terapia con decadrón y luego el 2 de marzo de 2018 solo recomendó medidas paliativas por ser un cáncer de pulmón avanzado con metástasis a huesos e hígado. Finalmente, el paciente falleció el 9 de marzo [de] 2018.

35. El perito de la parte demandada, Dr. José A. Rivera Guzmán no hace referencia en su informe pericial de ninguna de las anteriores quejas sobre dolor en el pecho o sobre los problemas de respiración del finado Ovidio Negrón Rivera.

36. En su informe pericial, concluyó el perito oncólogo del demandante, Dr. Raúl Morales Borges: "En cuanto al cuadro clínico, se presentan con síntomas respiratorios como tos, dolor de pecho, dificultad respiratoria, entre otros…".

37. En su informe pericial, concluyó el perito oncólogo del demandante, Dr. Raúl Morales Borges: "La detección temprana, mediante la prueba de tomografía computarizada de dosis bajas, puede disminuir la

mortalidad por cáncer de pulmón en un 14 a 20 por ciento entre las poblaciones de alto riesgo.".

38. En el informe pericial del Dr. José A. Rivera Guzmán, perito de la parte demandada se confirmó, mediante un cateterismo cardiaco realizado el 16 de septiembre de 2014 al finado Ovidio Negrón Rivera, una enfermedad coronaria no obstructiva y que la misma se manejó con terapia médica.

39. Según la Organizaci6n Mundial de la Salud (OMS) el cáncer de pulmón ocupa el primer lugar de incidencia mundial, seguido en segundo lugar por el cáncer de seno en las mujeres / cáncer de próstata en hombres y en tercer lugar por el cáncer de colon.

40. El cáncer de pulmón es más frecuente entre los fumadores (85% son NSCLC). La segunda causa se asocia a la exposición residencial al gas radón (Ra). Por lo tanto, sólo se recomienda estudios de prevención temprana (screening) como la tomografía de pecho a bajas dosis de radiación en población de alto riesgo como fumadores activos de > 30 paquetes al año o que hayan dejado de fumar en los últimos 15 años. Por esta razón en la población general que no son fumadores, ni que presentan ningún síntoma (falta de aire, tos, tos con sangre) no se acostumbra a ordenar estudios de imagen (CT/placa de pecho).

41. El Sr. Negrón Rivera no era fumador, no vivió en áreas residenciales con altos niveles de gas radón y no tenía ningún historial de exposición de asbesto en el trabajo. La exposición de asbesto aumenta el riesgo para desarrollar cáncer de pulmón por 5x en los no fumadores y 50x en los fumadores.

42. El Sr. Negrón Rivera no tuvo ninguna presentación clínica que sugiriese cáncer de pulmón como es falta de aire al descanso o al ejercicio, tos crónica, tos con sangre, dolor pleurítico o pérdida de peso. Por estas razones, es poco probable que el Dr. Ramírez considerara ordenar un CT de pecho u algún otro estudio de imagen para prevención temprana (screening).

43. Una placa de pecho del 30 de septiembre de 2016, en el expediente médico de Sala de Emergencia del Hospital de la Concepción, no presenta patología alguna.

44. La mayoría de los cánceres de pulmón se diagnostican cuando están con metástasis avanzada (estadios III y IV). En estos casos la sobrevida a cinco años después del tratamiento está entre el 17-20%.

45. El Dr. Ramírez Ramos no cometió ninguna falta en el tratamiento preventivo porque el paciente no estaba en el grupo de alto riesgo, no exhibió ninguna queja clínica previa para considerar realizar un CT ni considerar referirlo a algún médico subespecialista (neumólogo u oncólogo).

A raíz de las anteriores determinaciones de hechos, el foro primario resolvió que no medió culpa o negligencia por parte del Dr. Ramírez Ramos y que, por consiguiente, sus actuaciones médicas no fueron la causa

próxima de los daños alegados. Por lo anterior, el foro primario sostuvo la desestimación de la demanda.

Inconforme, el 5 de mayo de 2025, la parte apelante acude ante nos mediante *Apelación Civil* y señala la comisión de cinco (5) errores por el foro primario, a saber:

> Incurrió en error el TPI en la apreciación de la prueba que tuvo ante sí y concluir que la conducta u omisiones del demandado Dr. José A. Ramírez Ramos no constituyeron la causa próxima de la muerte de quien fuera don Ovidio Negrón Rivera. Lo anterior se desprende al analizar las coincidencias en partes sustanciales de la prueba pericial de la parte demandada con aquella prueba aportada por la parte demandante.

> Incidió el TPI al desestimar la demanda, no obstante haber enmendado la sentencia original para incluir una parte sustancial de las determinaciones de hechos solicitadas por la parte apelante, las cuales sostienen que el demandado apelado, Dr. José A. Ramírez Ramos, desatendió por años las reiteradas quejas del finado Ovidio Negrón Rivera y no ordenó los estudios necesarios ni hizo esfuerzo de conciencia para intentar realizar un diagnóstico adecuado, lo que provocó la muerte a este último.

> Erró el TPI al no concluir que la conducta del demandado apelado, Dr. José A. Ramírez Ramos, se apartó de las normas aceptadas según los modernos medios de comunicación y enseñanza de la profesión médica.

> Incurrió en error el TPI en la apreciación de la prueba al no estar sostenida la sentencia enmendada emitida con aquella prueba testimonial pericial y documental, consistente esta última, esencialmente, en el expediente médico del finado Ovidio Negrón Rivera en la oficina del demandado apelado, Dr. José A. Ramírez Ramos.

> Incurrió en error el TPI al emitir la sentencia enmendada, cuando descarta los fundamentos expresados por el perito de la parte demandante, Dr. Raúl Morales Borges, oncólogo, quien apreció el historial del finado Ovidio Negrón Rivera para concluir que el demandado Dr. José A. Ramírez Ramos fue negligente y se apartó de la mejor práctica de la medicina.

El 5 de junio de 2025, compareció la parte apelada mediante *Alegato en Oposición a Apelación*. Tras varios incidentes procesales innecesarios pormenorizar, el 9 de octubre de 2025, emitimos una *Resolución* admitiendo la *Moción para someter Complemento de Exposición Narrativa de la Prueba Oral Estipulada,* instada por la parte apelante el 23 de septiembre de 2025, y le concedimos hasta el 10 de noviembre de 2025 para presentar su alegato suplementario, el cual fue presentado. Asimismo,

concedimos a la parte apelada hasta el 10 de diciembre de 2025 para presentar su alegato. El 10 de diciembre de 2025, la parte apelada instó su *Alegato en Oposición a Apelación*. Contando con la comparecencia de las partes, nos encontramos en posición de resolver.

## II

## A.

Es norma reconocida que los foros apelativos no debemos intervenir con las determinaciones de los tribunales de instancia, salvo que se demuestre que hubo un craso abuso de discreción, o que el tribunal actuó con prejuicio o parcialidad, o que se equivocó en la interpretación o aplicación de cualquier norma procesal o de derecho sustantivo, y que la intervención en esa etapa evitará un perjuicio sustancial. Véase, *Lluch v. España Service Sta*., 117 DPR 729, 745 (1986). La discreción judicial no se da en un vacío ni en ausencia de otros parámetros, sino que como tribunal revisor debemos ceñirnos a los criterios transcritos. Cónsono con lo anterior, es norma reiterada en nuestro ordenamiento jurídico que los jueces de instancia son quienes están en mejor posición de aquilatar la prueba que tienen ante sí y que la apreciación que de ella realizan merece de nuestra parte, como tribunal revisor, gran respeto y deferencia. *Pérez Cruz v. Hosp. La Concepción*, 115 DPR 721, 728 (1984). Por ello, la norma es que, ante la ausencia de error manifiesto, prejuicio, pasión o parcialidad, no intervendremos con las conclusiones de hechos o con la apreciación de la prueba que haya realizado el foro primario. *Id*.

En *Pueblo v. Toro Martínez*, 200 DPR 834, 857 (2018), se afirmó lo siguiente:

> El juez sentenciador es ante quien deponen los testigos. Este es quien tiene la oportunidad de verlos y observar su manera de declarar. Así pues, como regla general, un tribunal revisor está vedado de intervenir con la adjudicación de credibilidad de los testigos, ni puede sustituir las determinaciones de hechos que a su amparo haya efectuado el foro primario basado en sus propias apreciaciones.

Los tribunales apelativos debemos brindarle gran deferencia al juzgador de los hechos, pues es este quien se encuentra en mejor posición

para evaluar la credibilidad de un testigo. Debido a que los foros apelativos contamos con récords mudos e inexpresivos, debemos respetar la adjudicación de credibilidad realizada por el juzgador primario de los hechos. *Trinidad v. Chade*, 153 DPR 280, 291 (2001).

No obstante, aun cuando la norma es de deferencia, podemos intervenir con estas conclusiones cuando la apreciación de la prueba que realizó el tribunal de instancias no represente el balance más racional, justiciero y jurídico de la totalidad de la prueba. *Ortiz v. Cruz Pabón*, 103 DPR 939, 946 (1975). La intervención del Tribunal de Apelaciones con la evaluación de la prueba testifical que haya realizado el Tribunal de Primera Instancia procede en aquellos casos en que un análisis integral de dicha prueba ocasione, en el ánimo del foro apelativo, una insatisfacción o intranquilidad de conciencia tal que hiera el sentido básico de justicia.

Así pues, la parte que cuestione una determinación de hechos realizada por el Tribunal de Instancia debe señalar el error manifiesto o fundamentar la existencia de pasión, prejuicio o parcialidad. *S.L.G. Rivera Carrasquillo v. A.A.A.*, 177 DPR 341, 356 (2009). Además, los señalamientos ante los tribunales apelativos tienen que estar sustentados con la prueba adecuada, debido a que meras alegaciones no son suficientes para mover nuestra facultad modificadora. *Henríquez v. Consejo Educación Superior*, 120 DPR 194, 210 (1987).

B.

El Artículo 1815 del Código Civil de 2020 establece, entre sus disposiciones de transición, que la responsabilidad civil extracontractual "se determina por la ley vigente en el momento en que ocurrió el acto u omisión que da lugar a dicha responsabilidad". 31 LPRA sec. 11720. En este caso, la cadena de sucesos que motivó la *Demanda* aconteció en el año 2018, previo a la entrada en vigor del nuevo código. Por ende, aplican los preceptos del derogado Código Civil de 1930.

El Artículo 1802 del Código Civil de 1930, según derogado, 31 LPRA sec. 5141, gobernaba lo relacionado a la responsabilidad civil derivada de

actos u omisiones culposas o negligentes. Para establecer responsabilidad bajo esta disposición era necesario que existiera un daño, una acción u omisión y la correspondiente relación causal entre el daño y la conducta culposa o negligente. La norma firmemente establecida en nuestra jurisdicción rezaba que, en toda causa de acción al amparo del Artículo 1802, *supra*, el demandante debía establecer: (1) la existencia de una acción u omisión productora del acto ilícito extracontractual, (2) la antijuridicidad de la misma, (3) la culpa o negligencia del agente, (4) la producción de un daño y (5) la relación causal entre la acción u omisión y el daño. *Valle v. E.L.A.*, 157 DPR 1, 14 (2002).

## C.

La responsabilidad civil por actos de mala práctica de la medicina debido a la impericia o negligencia de un facultativo emana del Artículo 1802 de Código Civil de 1930, *supra*. *López v. Dr. Cañizares*, 163 DPR 119, 132 (2004). Dicho artículo dispone que, "[e]l que por acción u omisión causa daño a otro, interviniendo culpa o negligencia, está obligado a reparar el daño causado". *Supra*. De esta forma, para imponer responsabilidad civil a un médico por actos de mala práctica al amparo del referido estatuto, es necesario la concurrencia de los requisitos siguientes: (1) realidad del daño sufrido; (2) un acto u omisión culposo o negligente; (3) nexo causal entre el daño y la referida acción culposa o negligente. *Cruz Flores et al. v. Hosp. Ryder et al.*, 210 DPR 465 (2022); *Pérez et al. v. Lares Medical et al.*, 207 DPR 965 (2021); *López v. Porrata Doria*, 169 DPR 135, 150 (2006). El acto negligente ha sido definido como:

> "el quebrantamiento del deber impuesto o reconocido por ley de ejercer, como lo haría un hombre prudente y razonable, aquel cuidado, cautela, circunspección, diligencia, vigilancia y precaución que las circunstancias del caso exijan, para no exponer a riesgos previsibles e irrazonables de daños como consecuencia de la conducta del actor, a aquellas personas que, por no estar ubicadas muy remotas de éste, un hombre prudente y razonable hubiese previsto, dentro de las circunstancias del caso, que quedaban expuestas al riesgo irrazonable creado por el actor." *López v. Dr. Cañizares*, *supra*, a la pág. 132.

A su vez, para que proceda una acción en daños, deberá existir una relación causal suficiente en derecho entre el acto negligente y los daños producidos, no siendo causa toda condición sin la cual no se hubiera producido el resultado, sino aquella que ordinariamente lo produce, según la experiencia general. *Sepúlveda de Arrieta v. Barreto*, 137 DPR 735, 759 (1994); *Montalvo v. Cruz*, 144 DPR 748, 755 (1998) y *Soc. de Gananciales v. Jerónimo Corp.*, 103 DPR 127, 134 (1974).

En cuanto a la responsabilidad de los médicos en el desempeño de sus funciones profesionales, se ha señalado que estos vienen en la obligación de brindar a sus pacientes aquella atención que, a la luz de los modernos medios de comunicación y enseñanza, y conforme al estado de conocimiento de la ciencia y la práctica prevaleciente de la medicina, satisface las exigencias profesionales generalmente reconocidas por la propia profesión médica. *Cruz Flores et al. v. Hosp. Ryder et al.*, *supra*; *López v. Dr. Cañizares*, *supra*; *Pérez Torres v. Blaudell Ramos*, 120 DPR 295, 302 (1988). El demandante deberá establecer mediante prueba pericial cuáles son los requisitos de cuidado y conocimiento científico requeridos por la profesión en el tratamiento de sus pacientes. *Id*. Esa prueba deberá demostrar cuáles son las exigencias de toda la profesión médica, a la luz de los conocimientos científicos disponibles mediante los medios de comunicación y programas de educación continuada. *Id*.; *Rodríguez Crespo v. Hernández*, 121 DPR 639, 650-651 (1988). Una vez demostrado cuáles son las normas mínimas de conocimiento y cuidado médico aplicables a la controversia en cuestión, el demandante deberá probar que el demandado incumplió con dichas normas en el tratamiento del paciente y que ello fue la causa de la lesión sufrida. *López v. Dr. Cañizares*, *supra*. Así, nuestro ordenamiento jurídico obliga al médico a responder por los daños y perjuicios causados tan sólo cuando actúa negligentemente, con descuido o falta de la pericia profesional que exigen las circunstancias. *Id*.

Al momento de evaluar la actuación de un médico debemos recordar, además, que este posee amplia discreción para formular juicio profesional en cuanto al diagnóstico y tratamiento médico. *Id*. De conformidad, no incurre en responsabilidad profesional, el médico que, ante las circunstancias particulares del caso ante sí, utiliza su buen juicio profesional a la luz de los criterios de razonabilidad y aceptación del sector médico. *Id*.; *Pérez Torres v. Blaudell Ramos*, *supra*. El error de juicio honesto e informado cometido por un médico en el tratamiento de su paciente tampoco constituye fuente de responsabilidad. *Id*.

Por otra parte, al evaluar una acción en daños por alegada impericia médica debemos tener presente que a los médicos les cobija una presunción a los efectos de que este ha ejercido un grado razonable de cuidado y el tratamiento fue el adecuado. *Id*.; *Ramos, Escobales v. García, González*, 134 DPR 969, 975-976 (1993). Por lo tanto, el demandante debe derrotar dicha presunción mediante preponderancia de prueba, demostrando que el médico fue negligente y que dicha conducta negligente fue el factor que con mayor probabilidad causó los daños alegados. La negligencia del médico no se presume por el hecho de que el paciente haya sufrido un daño o que el tratamiento no haya tenido éxito. *Rodríguez Crespo v. Hernández*, *supra*. De igual forma, la parte demandante no podrá descansar, para rebatir la presunción de corrección a favor del médico, en una mera posibilidad de que el daño se debió al incumplimiento del médico de su obligación profesional. *López v. Dr. Cañizares*, *supra*.

**III**

En el caso de título, la parte apelante nos solicita la revisión de una *Sentencia Enmendada* emitida por el Tribunal de Primera Instancia en la cual desestimó el pleito contra la parte apelada, y señala la comisión de cinco (5) errores. Por la naturaleza de los errores esbozados, estos serán discutidos en conjunto. Veamos.

La parte apelante ataca la apreciación de la prueba que realizó el foro primario; señala que incidió al concluir que la conducta u omisiones del

apelado, el Dr. Ramírez Ramos, no constituyeron la causa próxima de la muerte del causante; y arguye que la Sentencia Enmendada no estuvo sostenida con la prueba testimonial pericial y documental. Es norma reconocida que los foros apelativos no debemos intervenir con las determinaciones de los tribunales de instancia, salvo que se demuestre que hubo un craso abuso de discreción, o que el tribunal actuó con prejuicio o parcialidad, o que se equivocó en la interpretación o aplicación de cualquier norma procesal o de derecho sustantivo, y que la intervención en esa etapa evitará un perjuicio sustancial. *Lluch v. España Service Sta*., *supra*. Asimismo, nuestro ordenamiento jurídico establece que "[l]as determinaciones de hechos basadas en testimonio oral no se dejarán sin efecto a menos que sean claramente erróneas, y se dará la debida consideración a la oportunidad que tuvo el tribunal sentenciador para juzgar la credibilidad de los testigos". Regla 42.2 de las Reglas de Procedimiento Civil, 32 LPRA Ap. V., R. 42.2. Por tanto, en ausencia de los preceptos previamente mencionados, concluimos que no se justifica nuestra intervención con las determinaciones realizadas por el foro primario, quien se encontraba en mejor posición para aquilatar la prueba testifical desfilada.

Ahora bien, el apelante sostuvo que incidió el foro primario al desestimar la demanda, pese a haber enmendado la sentencia original para incorporar determinaciones de hechos sustanciales propuestas por su parte, ya que el apelado desatendió por años las quejas del causante, no ordenó los estudios necesarios ni procuró un diagnóstico adecuado, lo que provocó el fallecimiento del causante. Asimismo, planteó que erró el foro primario al concluir que la conducta del Dr. Ramírez Ramos no se apartó de las normas aceptadas según los modernos medios de comunicación y enseñanza de la profesión médica, al descartar el testimonio del perito de la parte apelante, quien concluyó que el Dr. Ramírez Ramos fue negligente y se apartó de la mejor práctica de la medicina.

Según surge de los autos, se confirmó mediante el informe y testimonio pericial del Dr. Morales Borges, perito de la parte apelante, que en septiembre de 2016 se le realizó una placa de pecho al causante en la Sala de Emergencia del Hospital de la Concepción, la cual reflejó que no se encontraba patología alguna en los pulmones.[8] Asimismo, indicó que el causante no visitó al apelado, el Dr. Ramírez, sino hasta un año y medio después, en enero 2018, cuando acudió por un problema de un pie y dolor de espalda. Fue en esta última fecha que comenzó la cadena de hechos que culminó con el fallecimiento del causante en marzo 2018.

A su vez, mediante su opinión experta, el Dr. Rivera Guzmán expresó que los factores de riesgo de cáncer del pulmón para el causante eran bajos, y que solo se recomiendan estudios de prevención temprana a poblaciones de alto riesgo, no siendo este el caso del causante.[9] Añadió que "el Dr. Ramírez fue diligente en dirigir sus esfuerzos a un diagnóstico para identificar lo que le estaba pasando a Don Ovidio, porque en aproximadamente cinco (5) semanas y se pudo identificar lo que estaba pasando."[10] Manifestó, además, que la mayoría de los cánceres de pulmón se diagnostican cuando están con metástasis avanzadas, y que la sobrevida de cinco (5) años, luego del tratamiento, se encuentra entre un diecisiete y un veinte por ciento (17%-20%). Por tanto, concluyó que el señor Ovidio se encontraba en el ochenta por ciento (80%) de la población que sufre este tipo de cáncer.

Según surge de las determinaciones de hechos realizadas por el foro primario, este concluyó que "[e]l Dr. Ramírez Ramos no cometió ninguna falta en el tratamiento preventivo porque el paciente no estaba en el grupo de alto riesgo, no exhibió ninguna queja clínica previa para considerar realizar un CT ni considerar referirlo a algún médico subespecialista (neumólogo u oncólogo)."[11] Nuestro Tribunal Supremo ha establecido que "un tribunal revisor está vedado de intervenir con la

---

[8] Índice de Exposición Narrativa de la Prueba Oral, pág. 8.
[9] *Id*, pág. 30.
[10] *Id*, pág. 33.
[11] Determinación de hecho 45.

adjudicación de credibilidad de los testigos, ni puede sustituir las determinaciones de hechos que a su amparo haya efectuado el foro primario basado en sus propias apreciaciones". *Pueblo v Toro Martínez, supra.*

Es importante resaltar que, en nuestro ordenamiento jurídico, se reconoce una presunción de corrección a favor del médico, por lo que correspondía a la parte apelante controvertirla mediante prueba suficiente que demostrara algo más que una mera posibilidad de que el daño reclamado obedeció al incumplimiento del médico con su deber profesional. No obstante, la parte apelante no logró acreditar que la causa más probable de los daños alegados fueron los actos negligentes del Dr. Ramírez. A la luz del testimonio pericial presentado por la parte apelada, el cual no fue eficazmente controvertido por la parte apelante, concluimos que las determinaciones de hechos y la apreciación realizada por el foro primario, en cuanto a la inexistencia de nexo causal entre el tratamiento médico brindado y la muerte del causante, son correctas. En consecuencia, concluimos que los errores señalados no fueron cometidos.

**IV**

Por los fundamentos antes expuestos, se confirma el dictamen apelado.

Lo acordó y manda el Tribunal y lo certifica la Secretaria del Tribunal de Apelaciones

Lcda. Lilia M. Oquendo Solís
Secretaria del Tribunal de Apelaciones